## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| SAMMY LEE, derivatively on behalf of OPKO HEALTH, INC., | |
| Plaintiff, | Case No. 1:21-cv-20885-CIV-ALTONAGA/Torres |
| v. | |
| PHILLIP FROST, ADAM LOGAL, JANE H. HSIAO, STEVEN D. RUBIN, ROBERT S. FISHEL, RICHARD M. KRASNO, RICHARD A. LERNER, JOHN A. PAGANELLI, RICHARD C. PFENNIGER, JR., and ALICE LIN-TSING YU, | **DEMAND FOR JURY TRIAL** |
| Defendants, | |
| and | |
| OPKO HEALTH, INC., | |
| Nominal Defendant. | |

## <u>VERIFIED SHAREHOLDER DERIVATIVE CONSOLIDATED AMENDED COMPLAINT</u>

## <u>INTRODUCTION</u>

Plaintiffs Sammy Lee ("Plaintiff Lee") and Andy Yu ("Plaintiff Yu," collectively, Plaintiffs"), by Plaintiffs' attorneys, derivatively on behalf of Nominal Defendant OPKO Health, Inc. ("OPKO" or the "Company") files this Verified Shareholder Derivative Consolidated Amended Complaint against Defendants Phillip Frost ("Frost"), Adam Logal ("Logal"), Jane H. Hsiao ("Hsiao"), Steven D. Rubin ("Rubin"), Robert S. Fishel ("Fishel"), Richard M. Krasno ("Krasno"), Richard A. Lerner ("Lerner"), John A. Paganelli ("Paganelli"), Richard C. Pfenniger, Jr. ("Pfenniger"), and Alice Lin-Tsing Yu ("Yu"), (collectively, the "Individual Defendants" and together with OPKO, the "Defendants") for breaches of their fiduciary duties as controlling shareholders, directors and/or officers of OPKO and violations of Section 14(a) of the

1

Securities Exchange Act of 1934 (the "Exchange Act"). As for Plaintiffs' complaint against the Individual Defendants, Plaintiffs allege the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of the Defendants' public documents, conference calls, and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding OPKO, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiffs believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by OPKO's controlling shareholders, directors and officers starting on, at least, April 30, 2018, and continuing through the present (the "Relevant Period").

2.      OPKO purports to be a diversified healthcare company engaged in both the diagnostics and pharmaceuticals business. OPKO's diagnostics business includes BioReference Laboratories, Inc. ("BioReference"), a wholly-owned subsidiary of the Company helmed by Defendant Logal, the Company's Senior Vice Present, Chief Financial Officer ("CFO"), Treasurer, and Chief Accounting Officer ("CAO") and managed or overseen by the Individual Defendants. OPKO's pharmaceutical business features treatment for various diseases.

3.      Throughout the Relevant Period, the Individual Defendants breached their fiduciary duties by, *inter alia*, falsely assuring the investing public in SEC filings and in corporate governance documents, that OPKO celebrates diversity and prides itself on its diverse staff and is

committed to creating and maintaining a healthy workplace where discrimination is not tolerated. The Company also maintained that diversity was a quality considered and accounted for in OPKO's director nomination process. Yet, as described herein, the Defendants acted in opposition to those statements.

4.     Specifically, the Individual Defendants caused misleading statements to be issued in three of Opko's annual proxy statements asserting its purported commitment to complying with the Code of Conduct and Business Ethics (the "Code of Conduct"), which requires individual dignity and autonomy be respected and safeguarded, while doing very little to curb discrimination occurring at the Company or its subsidiaries. Indeed, this is demonstrated by the fact that OPKO's Board of Directors (the "Board") consisted of *zero* Black or Latinx members during the Relevant Period. Similarly, its management and leadership have *zero* Black employees. Moreover, during the Relevant Period, at least one Black employee initiated a lawsuit alleging, among other things, race discrimination by the Company's subsidiary, BioReference.

5.     Only half a century ago, almost every single board of directors in America was solely comprised of White men. Since, most corporations have made gradual but steady progress to inculcate more diverse representation on their boards and within their executive management teams.

6.     In a recent post, published by *Calvert Research and Management* following civil unrest that coincided the killing of George Floyd, among others, John Streur stated the following, in relevant part:

> We are a country suffering from racial inequality. And we want the inequality and suffering to end.
>
> Enough people agree with these points that this issue has become a matter that will impact every corporation doing business in this country. Companies that are capable of understanding their roles in taking effective action to end inequality will

benefit operationally and reputationally; those that refuse to acknowledge their exposure to this massive problem or that are incapable of swift and effective action will struggle to maintain their competitive positions as employers and with consumers.

7.      Notwithstanding this societal imperative, while other companies have been dedicated to achieving a significant increase in diversity within their highest ranks and workforce, the Individual Defendants have caused OPKO to violate federal and state laws regarding diversity and discrimination during the Relevant Period by, *inter alia*, repeatedly refusing to nominate, appoint, and/or hire Black or Latinx individuals or other underrepresented minorities to the Board or Black individuals to the executive management team (the "Discriminatory Misconduct"). Ironically, OPKO holds itself out to be committed to "creat[ing] and maintain[ing] a healthy work place" by declaring in the Company's Code of Conduct that "discrimination in not tolerated" and that employment decisions must not be predicated on things such as "race" and "color." Yet, *zero* Black or Latinx individuals currently reside on the Company's Board and *zero* Black individuals work on the Company's executive management team.

8.      Moreover, although the Individual Defendants, asserted their adherence to the Company's Code of Conduct in OPKO's annual proxy statements, and asserted that the Nominating and Corporate Governance Committee sought director candidates that would bring a diversity of "knowledge," "experience," and "skills" to the Board, the actions of the Individual Defendants demonstrate these are hollow words.

9.      In breach of their fiduciary duties, during the Relevant Period, the Individual Defendants permitted the Discriminatory Misconduct, engaged in and caused the Company to engage in the Discriminatory Misconduct, and continuously failed to and caused the Company to fail to maintain adequate internal controls.

10.    The Individual Defendants have deceived the public by claiming to abide by certain antidiscrimination policies. By engaging and allowing the Discriminatory Misconduct, the Individual Defendants have breached their duty of candor and have also violated the federal securities laws.

11.    Not only is the Discriminatory Misconduct unethical and illegal, it is also against the best interest of the Company, given that the companies with the most ethnically or culturally diverse boards worldwide are 43% more likely to experience higher profits, according to a 2018 McKinsey & Company report.[1]

12.    In addition, the Individual Defendants breached their fiduciary duties by continuing to appoint Ernst & Young LLP ("E&Y") as independent auditor despite E&Y failing to properly audit and assess the Company's inadequate internal controls.

13.    The Individual Defendants also violated Section 14(a) of the Exchange Act, which violation also comprises a breach of fiduciary duty, as the 2018, 2019, and 2020 Proxy Statements (defined below) were false and misleading for failing to disclose, *inter alia*, that: (1) the Discriminatory Misconduct; (2) upon information and belief, the Company does not have term limits due to a desire to keep Black, Latinx, and other underrepresented individuals off of the Board; (3) the independent auditor the Company repeatedly reselected to evaluate its internal controls was neither independent nor effective at ensuring the adequacy of the Company's internal controls; and (4) the Company failed to maintain adequate internal controls.

14.    As a result of the Individual Defendants' misconduct, which has subjected OPKO to, *inter alia*, the need to undertake internal investigations and the need to implement adequate

---

[1] https://www.mckinsey.com/~/media/mckinsey/business%20functions/organization/our%20insights/delivering%20through%20diversity/delivering-through-diversity_full-report.ashx, p.14. Last visited February 24, 2021.

internal controls, and to the loss of profits resulting from the Discriminatory Misconduct, the Company has lost and expended and will lose and expend millions of dollars.

15.    In light of the breaches of fiduciary duty committed by the Individual Defendants, most of whom are the Company's current directors constituting a majority of the present Board, their collective engagement in the scheme to engage in and cause the Company to engage in the Discriminatory Misconduct and to make the false and misleading statements, the substantial likelihood of the directors' liability in this derivative action, their being beholden to each other, their longstanding business and personal relationships with each other, and their not being disinterested and/or independent directors, a majority of the Board cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## PARTIES

### Plaintiffs

16.    Plaintiff Lee is a current shareholder of OPKO common stock. Plaintiff Lee has continuously held OPKO common stock since before the beginning of the Relevant Period.

17.    Plaintiff Yu is a current shareholder of OPKO common stock. Plaintiff Yu has continuously held OPKO common stock at all relevant times.

### Nominal Defendant OPKO

18.    OPKO is a Delaware corporation with its principal executive offices at 4400 Biscayne Blvd., Miami, Florida 33137. OPKO's shares trade on the NASDAQ Global Select Market ("NASDAQ") under the ticker symbol "OPK."

### Defendant Frost

19.    Defendant Frost has served as a Company director and as the Company's Chief Executive Officer ("CEO") and Chairman since March 2007. According to the Company's

6

Schedule 14A filed with the SEC on April 29, 2020 (the "2020 Proxy Statement"), as of April 27, 2020, Defendant Frost beneficially owned 229,017,822 shares of the Company's common stock, which represented 33.86% of outstanding shares on that date. Given that the price per share of the Company's common stock at the close of trading on April 27, 2020 was $2.20, Defendant Frost owned approximately $504 million worth of OPKO stock.

20.     For the fiscal year ended December 31, 2019, Defendant Frost received $1,405,200 in compensation. This included $960,000 in salary, $434,000 in option awards, $11,200 in all other compensation. For the fiscal year ended December 31, 2018, Defendant Frost received $2,036,000 in compensation from the Company. This included $960,000 in salary, $1,065,000 in option awards, and $11,000 in all other compensation.

21.     The 2020 Proxy Statement stated the following about Defendant Frost, in relevant part:

> **Phillip Frost, M.D.** Dr. Frost has been the Chief Executive Officer of the Company and Chairman of the Board since March 2007. Dr. Frost serves as a director for Cocrystal Pharma, Inc. (NASDAQ GM:COCP), a biotechnology company developing new treatments for viral diseases. He has been a member of the Board of Trustees of the University of Miami since 1983 and was Chairman from 2001 to 2004. He is on the Advisory Board of the Shanghai Institute for Advanced Immunochemical Studies in China, and The Florida Council of 100 and is a trustee of the Miami Jewish Home for the Aged and serves on the Executive Committee of the Board of Mount Sinai Medical Center. He serves as Chairman of Temple Emanu-El, Governor of Tel Aviv University and is a member of the Executive Committee of The Phillip and Patricia Frost Museum of Science. Dr. Frost served as a director of Ladenburg Thalmann Financial Services Inc. from 2004 to 2006 and as Chairman from July 2006 until September 2018. Dr. Frost served as Vice Chairman of Teva Pharmaceutical Industries, Limited (NYSE:TEVA) from January 2006 until February 2015 and as Chairman from March 2010 until December 2014. He previously served as an Expert Member of the Scientific Advisory Council of the Skolkovo Foundation in Russia. Dr. Frost previously served as Vice Chairman of Cogint, Inc., now known as Fluent, Inc. (NASDAQ:FLNT), and as a director for Castle Brands (NYSE American:ROX), Sevion Therapeutics, Inc. prior to its merger with Eloxx Pharmaceuticals, Inc. (NASDAQ:ELOX), and TransEnterix, Inc. (NYSE American:TRXC). Dr. Frost had served as Chairman of the Board of Directors and Chief Executive Officer of

IVAX Corporation ("IVAX") from 1987 until its acquisition by Teva in January 2006. Dr. Frost was Chairman of the Board of Directors of Key Pharmaceuticals, Inc. from 1972 until its acquisition by Schering Plough Corporation in 1986. Dr. Frost was a Governor of the American Stock Exchange from 1992 to 2008 and Co-Vice Chairman from 2001 until its merger with the New York Stock Exchange.

Dr. Frost has successfully founded several pharmaceutical companies and overseen the development and commercialization of a multitude of pharmaceutical products. This, combined with his experience as a physician and chairman and/or chief executive officer of large pharmaceutical companies, has given him insight into virtually every facet of the pharmaceutical business and drug development and commercialization process. He is a demonstrated leader with keen business understanding and is uniquely positioned to help guide our Company through its transition from a development stage company into a successful, multinational biopharmaceutical and diagnostics company.

**Defendant Logal**

22.     Defendant Logal has served as the Company's Senior Vice President, CFO, CAO, and Treasurer since March 2014. Previously, he served as the Company's Vice President of Finance, CAO, and Treasurer from July 2012 until March 2014, and as the Company's Director of Finance, CAO, and Treasurer from March 2007 until July 2012. According to the 2020 Proxy Statement, as of April 27, 2020, Defendant Logal beneficially owned 1,079,162 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 27, 2020 was $2.20, Defendant Logal owned approximately $2.4 million worth of OPKO stock.

23.     For the fiscal year ended December 31, 2019, Defendant Logal received $921,200 in compensation. This included $600,000 in salary, $310,000 in option awards, $11,200 in all other compensation. For the fiscal year ended December 31, 2018, Defendant Logal received $1,250,000 in compensation from the Company. This included $600,000 in salary, $639,000 in option awards, and $11,000 in all other compensation.

8

24.     The 2020 Proxy Statement stated the following about Defendant Logal, in relevant part:

> **Adam Logal**. Mr. Logal has served as OPKO's Senior Vice President, Chief Financial Officer, Chief Accounting Officer, and Treasurer since March 2014, Vice President of Finance, Chief Accounting Officer and Treasurer from July 2012 until March 2014, and Director of Finance, Chief Accounting Officer and Treasurer from March 2007 until July 2012. He currently serves as chairman of the board of directors of Xenetics Biosciences, Inc. (NASDAQ CM:XBIO), a clinical-stage biopharmaceutical company focused on discovery, research and development of next-generation biologic drugs and novel orphan oncology therapeutics. He previously served on the board of directors of VBI Vaccines, Inc. (NASDAQ:VBIV) from April 2014 until 2018. From 2002 to 2007, Mr. Logal served in senior management of Nabi Biopharmaceuticals, a publicly traded, biopharmaceutical company engaged in the development and commercialization of proprietary products. Mr. Logal held various positions of increasing responsibility at Nabi Biopharmaceuticals, last serving as Senior Director of Accounting and Reporting.

### Defendant Hsiao

25.     Defendant Hsiao has served as a Company director since February 2007 and as the Company's Chief Technical Officer ("CTO") and Vice-Chairman since May 2007. According to the 2020 Proxy Statement, as of April 27, 2020, Defendant Hsiao beneficially owned 35,139,764 shares of the Company's common stock, which represented 5.23% of shares on that date. Given that the price per share of the Company's common stock at the close of trading on April 27, 2020 was $2.20, Defendant Hsiao owned over $77.3 million worth of OPKO stock.

26.     For the fiscal year ended December 31, 2019, Defendant Hsiao received $1,345,200 in compensation. This included $900,000 in salary, $434,000 in option awards, $11,200 in all other compensation. For the fiscal year ended December 31, 2018, Defendant Hsiao received $1,976,000 in compensation from the Company. This included $900,000 in salary, $1,065,000 in option awards, and $11,000 in all other compensation.

27.     The 2020 Proxy Statement stated the following about Defendant Hsiao, in relevant

part:

**Jane H. Hsiao, Ph.D., MBA.** Dr. Hsiao has served as Vice-Chairman and Chief
Technical Officer of the Company since May 2007 and as a director since February
2007. Dr. Hsiao has served as Chairman of the Board of Non-Invasive Monitoring
Systems, Inc. (OTC US:NIMU), a medical device company, since October 2008
and was named Interim Chief Executive Officer of Non-Invasive Monitoring
Systems, Inc. in February 2012. Dr. Hsiao is also a director of each of TransEnterix,
Inc. (NYSE American:TRXC), a medical device company, and Cocrystal Pharma,
Inc. (NASDAQ GM:COCP), a biotechnology company developing new treatments
for viral diseases. Dr. Hsiao previously served as a director of Neovasc, Inc.
(NASDAQ CM:NVCN), a company developing and marketing medical specialty
vascular devices. Dr. Hsiao served as the Vice Chairman-Technical Affairs of
IVAX from 1995 to January 2006. Dr. Hsiao served as Chairman, Chief Executive
Officer and President of IVAX Animal Health, IVAX's veterinary products
subsidiary, from 1998 to 2006.

Dr. Hsiao's background in pharmaceutical chemistry and strong technical
expertise, as well as her senior management experience, allow her to play an
integral role in overseeing our product development and regulatory affairs and in
navigating the regulatory pathways for our products and product candidates. In
addition, as a result of her role as director and/or chairman of other companies in
the biotechnology and life sciences industry, she also has a keen understanding and
appreciation of the many regulatory and development issues confronting
pharmaceutical and biotechnology companies.

**Defendant Rubin**

28.     Defendant Rubin has served as a Company director since February 2007 and as the

Company's Executive Vice President – Administration since May 2007. According to the 2020

Proxy Statement, as of April 27, 2020, Defendant Rubin beneficially owned 7,891,090 shares of

the Company's common stock, which represented 1.18% of shares on that date. Given that the

price per share of the Company's common stock at the close of trading on April 27, 2020 was

$2.20, Defendant Rubin owned approximately $17.4 million worth of OPKO stock.

29.     For the fiscal year ended December 31, 2019, Defendant Rubin received

$1,131,200 in compensation. This included $810,000 in salary, $310,000 in option awards,

—

$11,200 in all other compensation. For the fiscal year ended December 31, 2018, Defendant Rubin

received $1,460,000 in compensation from the Company. This included $810,000 in salary,

$639,000 in option awards, and $11,000 in all other compensation.

30.     The 2020 Proxy Statement stated the following about Defendant Rubin, in relevant

part:

> **Steven D. Rubin.** Mr. Rubin has served as Executive Vice President –
> Administration since May 2007 and as a director of the Company since February
> 2007. Mr. Rubin currently serves on the board of directors of Red Violet, Inc.
> (NASDAQ CM:RDVT), a software and services company, Non-Invasive
> Monitoring Systems, Inc. (OTC US:NIMU), a medical device company, Cocrystal
> Pharma, Inc. (NASDAQ GM:COCP), a publicly traded biotechnology company
> developing new treatments for viral diseases, Eloxx Pharmaceuticals, Inc.
> (NASDAQ:ELOX), a clinical stage biopharmaceutical company dedicated to
> treating patients suffering from rare and ultra-rare disease caused by premature
> termination codon nonsense mutations, Neovasc, Inc. (NASDAQ CM:NVCN), a
> company that develops and markets medical specialty vascular devices, and
> ChromaDex Corp. (NASDAQ CM:CDXC), a science-based, integrated
> nutraceutical company devoted to improving the way people age. Mr. Rubin
> previously served as a director of VBI Vaccines, Inc. (NASDAQ CM:VBIV), a
> biopharmaceutical company developing next generation vaccines, BioCardia,
> Inc.(NASDAQ GS: BCDA), a clinical-stage regenerative medicine company
> developing novel therapeutics for cardiovascular diseases, Cogint, Inc. (NASDAQ
> GM:COGT), now known as Fluent, Inc. (NASDAQ:FLNT), an information
> solutions provider focused on the data-fusion market, prior to the spin-off of its data
> and analytics operations and assets into Red Violet, Inc., Kidville, Inc.
> (OTCBB:KVIL), which operates large, upscale facilities, catering to newborns
> through five-year-old children and their families and offers a wide range of
> developmental classes for newborns to five-year-olds, Sevion Therapeutics, Inc.,
> prior to its merger with Eloxx Pharmaceuticals, Inc., Dreams, Inc. (NYSE
> American:DRJ), a vertically integrated sports licensing and products company,
> SciVac Therapeutics, Inc. prior to its merger with VBI Vaccines, Inc., Tiger X
> Medical, Inc. prior to its merger with BioCardia, Inc., and Castle Brands, Inc.
> (NYSE American:ROX), a developer and marketer of premium brand spirits. Mr.
> Rubin also served as the Senior Vice President, General Counsel and Secretary of
> IVAX from August 2001 until September 2006.
>
> Mr. Rubin brings extensive leadership, business, and legal experience, as well as
> tremendous knowledge of our business and the pharmaceutical industry generally,
> to the Board. He has advised pharmaceutical companies in several aspects of
> business, regulatory, transactional, and legal affairs for more than 25 years. His
> experience as a practicing lawyer, general counsel, management executive and

board member to multiple public companies, including several pharmaceutical and life sciences companies, has given him broad understanding and expertise, particularly relating to strategic planning and acquisitions.

**Defendant Fishel**

31.     Defendant Fishel has served as a Company director since April 2018. He also serves as the Chair of the Independent Investment Committee, as a member of the Compensation Committee, and as a member of the Succession Committee. According to the 2020 Proxy Statement, as of April 27, 2020, Defendant Fishel beneficially owned 4,200,728 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 27, 2020 was $2.20, Defendant Fishel owned over $9.2 million worth of OPKO stock.

32.     For the fiscal year ended December 31, 2019, Defendant Fishel received $48,917 in compensation. This included $27,917 in fees earned or paid in cash and $21,000 in option awards. For the fiscal year ended December 31, 2018, Defendant Fishel received $112,213 in compensation from the Company. This included $17,813 in fees earned or paid in cash and $94,400 in option awards.

33.     The 2020 Proxy Statement stated the following about Defendant Fishel, in relevant part:

> **Robert S. Fishel, M.D.** Dr. Fishel has served on the Company's Board of Directors since April 2018.  Dr. Fishel serves as a director of several private companies.  He is a director and founder of Florida Electrophysiology Associates, a premiere medical practice specializing in cardiac rhythm disorders, and has been the Chief Executive Officer and President since 1997. He has also served as a director and senior managing partner of Renaissance Properties, a multi-faceted real estate development firm, since 1989, a director and founding partner of Catalyst Development Partners, a real estate development firm focused on multifamily acquisition and development opportunities, since 2009, a director and president of ALSAR Ltd Partnership, an investment partnership with investments in public equities, debt and derivatives, since 1996, and as a director, founder, and Chief Medical Officer of NewPace, Ltd., a company engaged in the research and

development of medical equipment, including a novel implantable subcutaneous string defibrillator (ISSD) for preventing sudden cardiac death, since 2012. Dr. Fishel is director of cardiac electrophysiology at JFK Medical Center in West Palm Beach, Florida and co-director of national electrophysiology research for the Hospital Corporation of America's Cardiovascular Research Council. Dr. Fishel is also the founder and CEO of ACT Pharmaceuticals, a company engaged in the development of a novel suite of products designed to treat various common serious cardiac arrhythmias.

Dr. Fishel's business background and his training and experience as a practicing physician are valuable in our efforts in the field of biotechnology. The insight he has gained as a practicing physician and from his investment and management experience with a number of business ventures will help drive the Company's commercial efforts and strategic direction.

**Defendant Krasno**

34.     Defendant Krasno has served as a Company director since February 2017. He also serves as a member of the Audit Committee, as a member of the Compensation Committee, as a member of the Independent Investment Committee, and as a member of the Succession Committee. According to the 2020 Proxy Statement, as of April 27, 2020, Defendant Krasno beneficially owned 173,333 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 27, 2020 was $2.20, Defendant Krasno owned approximately $381,333 worth of OPKO stock.

35.     For the fiscal year ended December 31, 2019, Defendant Krasno received $56,000 in compensation. This included $35,000 in fees earned or paid in cash and $21,000 in option awards. For the fiscal year ended December 31, 2018, Defendant Krasno received $75,000 in compensation from the Company. This included $35,000 in fees earned or paid in cash and $40,000 in option awards.

36.     The 2020 Proxy Statement stated the following about Defendant Krasno, in relevant part:

**Richard M. Krasno, Ph.D.** Dr. Krasno has served on the Company's Board of Directors since February 2017. Dr. Krasno has been a private investor in companies for the past five (5) years. Dr. Krasno also served as the executive director of the William R. Kenan, Jr. Charitable Trust (the "Trust") from 1999 to 2014, and from 1999 to 2010, as President of the four affiliated William R. Kenan, Jr. Funds. Prior to joining the Trust, Dr. Krasno was the President of the Monterey Institute of International Studies in Monterey, California. From 2004 to 2012, Dr. Krasno also served as a Director of the University of North Carolina Health Care System and served as chairman of its board of directors from 2009 to 2012. From 1981 to 1998, he served as President and Chief Executive Officer of the Institute of International Education in New York. He also served as Deputy Assistant Secretary of Education in Washington, D.C. from 1979 to 1980. Dr. Krasno currently serves as a director of BioCardia, Inc. (NASDAQ GS: BCDA). He previously served as a director of Ladenburg Thalmann (NYSE American:LTS) and Castle Brands, Inc. (NYSE American:ROX). Dr. Krasno holds a Bachelor of Science from the University of Illinois and a Ph.D. from Stanford University.

Dr. Krasno's pertinent skills and experience, including his financial literacy and expertise, managerial experience and the knowledge he has attained through his service as a director of publicly-traded corporations have added and will continue to add valuable insight to our Board on a wide range of business and operational issues.

**Defendant Lerner**

37.     Defendant Lerner has served as a Company director since March 2007. He also serves as the Chair of the Compensation Committee and as a member of the Corporate Governance and Nominating Committee. According to the 2020 Proxy Statement, as of April 27, 2020, Defendant Lerner beneficially owned 338,881 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 27, 2020 was $2.20, Defendant Lerner owned over $745,538 worth of OPKO stock.

38.     For the fiscal year ended December 31, 2019, Defendant Lerner received $51,000 in compensation. This included $30,000 in fees earned or paid in cash and $21,000 in option awards. For the fiscal year ended December 31, 2018, Defendant Lerner received $70,000 in compensation from the Company. This included $30,000 in fees earned or paid in cash and $40,000 in option awards.

39.     The 2020 Proxy Statement stated the following about Defendant Lerner, in relevant

part:

> **Richard A. Lerner, M.D.** Dr. Lerner has served on the Company's Board of
> Directors since March 2007. Dr. Lerner served as President of The Scripps
> Research Institute, a private, non-profit biomedical research organization, from
> 1986 until 2012 and is currently serving as Institute Professor. Dr. Lerner is a
> member of numerous scientific associations, including the National Academy of
> Science and the Royal Swedish Academy of Sciences. Dr. Lerner serves as director
> of Intra-Cellular Therapies, Inc. (NASDAQ:ITCI), a biotechnology company. He
> previously served as a director of Kraft Foods, Inc., Teva and Sequenom, Inc. and
> on the Advisory Board for Molecular Medicine of Siemens AG.
>
> As a result of Dr. Lerner's long tenure as president of a major biomedical research
> organization, he provides valuable business, scientific, leadership, and management
> expertise that helps drive strategic direction and expansion at OPKO. His
> experience and training as a physician and a scientist enables him to bring valuable
> advice to the Board, including a critical perspective on drug discovery and
> development and provide a fundamental understanding of the potential pathways
> contributing to disease.

**Defendant Paganelli**

40.     Defendant Paganelli has served as a Company director since December 2003. He

also serves as the Chair of the Corporate Governance and Nominating Committee, as a member of

the Audit Committee, and as a member of the Independent Investment Committee. Previously,

Defendant Paganelli served as the Company's Interim CEO and Secretary from June 29, 2005

through March 27, 2007, the Company's Interim CFO from June 29, 2005 through July 1, 2005,

and Chairman of our Board from December 2003 through March 27, 2007. According to the 2020

Proxy Statement, as of April 27, 2020, Defendant Paganelli beneficially owned 508,515 shares of

the Company's common stock. Given that the price per share of the Company's common stock at

the close of trading on April 27, 2020 was $2.20, Defendant Paganelli owned over $1.1 million

worth of OPKO stock.

41.     For the fiscal year ended December 31, 2019, Defendant Paganelli received $56,000 in compensation. This included $35,000 in fees earned or paid in cash and $21,000 in option awards. For the fiscal year ended December 31, 2018, Defendant Paganelli received $75,000 in compensation from the Company. This included $35,000 in fees earned or paid in cash and $40,000 in option awards.

42.     The 2020 Proxy Statement stated the following about Defendant Paganelli, in relevant part:

> **John A. Paganelli.** Mr. Paganelli has served on the Company's Board of Directors since December 2003. Mr. Paganelli served as the Company's Interim Chief Executive Officer and Secretary from June 29, 2005 through March 27, 2007, the Company's Interim Chief Financial Officer from June 29, 2005 through July 1, 2005, and Chairman of our Board from December 2003 through March 27, 2007. Mr. Paganelli served as President and Chief Executive Officer of Transamerica Life Insurance Company of New York from 1992 to 1997. Since 1987, Mr. Paganelli has been a partner in RFG Associates, a financial planning organization. Mr. Paganelli is also the Managing Partner of Pharos Systems Partners, LLC, an investment company, and he is Chairman of the Board of Pharos Systems International, a software company. He was Vice President and Executive Vice President of PEG Capital Management, an investment advisory organization, from 1987 until 2000. Mr. Paganelli also serves as a director of Western New York Energy, LLC and was on the Board of Trustees of Paul Smith's College from 2011 to 2019.
>
> With his significant experience in investment management and operations, Mr. Paganelli is able to add valuable expertise and insight to our Board on a wide range of operational and financial issues. As one of the longest tenured members of our Board, he also has substantial knowledge and familiarity regarding our historical operations.

### Defendant Pfenniger

43.     Defendant Pfenniger has served as a Company director since January 2008. He also serves as the Chair of the Audit Committee and as a member of the Succession Committee. According to the 2020 Proxy Statement, as of April 27, 2020, Defendant Pfenniger beneficially owned 455,000 shares of the Company's common stock. Given that the price per share of the

Company's common stock at the close of trading on April 27, 2020 was $2.20, Defendant Pfenniger owned over $1.0 million worth of OPKO stock.

44.     For the fiscal year ended December 31, 2019, Defendant Pfenniger received $66,500 in compensation. This included $35,000 in fees earned or paid in cash and $31,500 in option awards. For the fiscal year ended December 31, 2018, Defendant Pfenniger received $95,000 in compensation from the Company. This included $35,000 in fees earned or paid in cash and $60,000 in option awards.

45.     The 2020 Proxy Statement stated the following about Defendant Pfenniger, in relevant part:

> **Richard C. Pfenniger, Jr.** Mr. Pfenniger is a private investor and has served as a director of the Company since January 2008. Mr. Pfenniger served as Interim CEO of Vein Clinics of America, Inc., a privately held company that specializes in the treatment of vein disease, from May 2014 to February 2015 and as Interim CEO of IntegraMed America, Inc., a privately held company that manages outpatient fertility medical centers, from January 2013 to June 2013. He served as Chief Executive Officer and President for Continucare Corporation, a provider of primary care physician and practice management services, from 2003 until 2011, and served as Chairman of the Board of Directors of Continucare Corporation from 2002 until 2011. Previously, Mr. Pfenniger served as the Chief Executive Officer and Vice Chairman of Whitman Education Group, Inc. from 1997 through June 2003. Prior to joining Whitman, he served as the Chief Operating Officer of IVAX from 1994 to 1997, and, from 1989 to 1994, he served as the Senior Vice President-Legal Affairs and General Counsel of IVAX Corporation. Prior thereto he was engaged in the private practice of law. Mr. Pfenniger currently serves as a director of GP Strategies Corporation (NYSE:GPX), a corporate education and training company, TransEnterix, Inc. (NYSE American:TRXC), a medical device company, BioCardia, Inc. (NASDAQ GS: BCDA), clinical-stage regenerative medicine company developing novel therapeutics for cardiovascular diseases, and IntegraMed America, Inc. , a private specialty healthcare services company offering products and services to patients and providers in the fertility and vein care segments of the health industry. He also serves as the Vice Chairman of the Board of Trustees and as a member of the Executive Committee of the Phillip and Patricia Frost Museum of Science. Mr. Pfenniger previously served as a director of Vein Clinics of America and Wright Investors' Services Holdings, Inc. (OTC US:WISH), an investment management and financial advisory firm.

As a result of Mr. Pfenniger's multi-faceted experience as chief executive officer, chief operating officer and general counsel, he is able to provide valuable business, leadership, and management advice to the Board in many critical areas. In addition, Mr. Pfenniger's knowledge of the pharmaceutical and healthcare business has given him insights on many aspects of our business and the markets in which we operate. Mr. Pfenniger also brings financial expertise to the Board, including through his service as Chairman of our Audit Committee.

### Defendant Yu

46.     Defendant Yu has served as a Company director since April 2009. According to the 2020 Proxy Statement, as of April 27, 2020, Defendant Yu beneficially owned 206,490 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 27, 2020 was $2.20, Defendant Yu owned approximately $454,278 worth of OPKO stock.

47.     For the fiscal year ended December 31, 2019, Defendant Yu received $41,000 in compensation. This included $20,000 in fees earned or paid in cash and $21,000 in option awards. For the fiscal year ended December 31, 2018, Defendant Yu received $60,000 in compensation from the Company. This included $20,000 in fees earned or paid in cash and $40,000 in option awards.

48.     The 2020 Proxy Statement stated the following about Defendant Yu, in relevant part:

**Alice Lin-Tsing Yu, M.D., Ph.D.** Dr. Yu has served on the Company's Board of Directors since April 2009. She has been a Professor of Pediatrics for the University of California in San Diego since 1994. Previously, she was the Chief of Pediatric Hematology Oncology at the University of California in San Diego. From 2003 to May 2013, Dr. Yu served as a Distinguished Research Fellow and Associate Director at the Genomics Research Center, Academia Sinica, in Taiwan. Dr. Yu has also served in several government-appointed advisory positions and is a member of numerous scientific committees and associations. She has been a long-time member of the Children's Oncology Group in the United States, serving on the Steering Committee of Neuroblastoma. She was honored with the Pediatric Oncology Award by the American Society of Clinical Oncology (ASCO) in 2020.

Dr. Yu is an accomplished physician, professor, and researcher who brings a unique perspective to our Board on a variety of healthcare related issues. As a pioneer in immunotherapy of neuroblastoma, Dr. Yu was instrumental in developing a monoclonal anti-GD2 (Dinutuximab) from IND through early phase studies and phase III trials, and facilitating its FDA approval on March 10, 2015. The insight and experience gained from her distinguished record of achievement at several highly respected academic medical institutions, as well as her experience as a practicing physician, continue to be valuable to our efforts to develop and commercialize our pipeline of diagnostic and therapeutic products.

**Non-Party Frost Gamma Investments Trust**

49.     Frost Gamma Investment Trust ("FGIT") is a Florida trust, formed in or around 2002. According to the 2020 Proxy Statement, as of April 27, 2020, FGIT beneficially owned 194,271,694 shares of OPKO's common stock, which represented 28.79% of outstanding shares on that date. According to the 2020 Proxy Statement, Defendant Frost controls FGIT and is in fact the trustee of FGIT.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

50.     Due to their positions as controlling shareholders, officers and/or directors as well as fiduciaries of OPKO, and because of their ability to control the business and corporate affairs of OPKO, the Individual Defendants owed OPKO and its shareholders fiduciary duties of trust, loyalty, good faith, and due care, and were, and are, required to use their utmost ability to control and manage OPKO in a fair, just, honest, and equitable manner. The Individual Defendants were, and are, required to act in the best interests of OPKO and its shareholders so as to benefit all shareholders equally.

51.     OPKO's directors and officers each owe to the Company and its shareholders a fiduciary duty of good faith and diligence in the administration of the Company's affairs as well as in the use, and preservation of, the Company's assets.

52.     Because they control the Company and each hold positions of authority, the Individual Defendants, as directors and/or officers, were able to, and did, directly and/or indirectly exercise control over the wrongful actions complained of herein.

53.     The Company's directors and officers were required to exercise reasonable and prudent supervision over the management, policies, internal controls, and operations of the Company to effectively discharge their duties.

54.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as controlling shareholders, directors, and officers of OPKO, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also controlling shareholders, officers, and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised OPKO's Board at all relevant times.

55.     As controlling shareholders, senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's operations, diversity efforts, and internal controls, and had a duty to cause the Company to disclose omissions

of material fact in its regulatory filings with the SEC including all those facts described in this complaint that it failed to disclose.

56.     The controlling shareholders, officers, and directors of OPKO, to effectively discharge their duties, were required to exercise reasonable and prudent supervision over the Company. Because of their duties, the controlling shareholders, officers, and directors of OPKO were required, *inter alia*, to:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, Florida, and the United States, and in accordance with OPKO's own Code of Conduct;

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to not waste the Company's assets, and to maximize the Company's value;

(c)     remain informed about the conduct of OPKO's operations, and, upon receipt of notice of imprudent or unsound practices, to make reasonable inquiry into such practices and to take steps to remedy them;

(d)     maintain comprehensive and accurate records and reports of the affairs of OPKO and to maintain procedures for reporting these affairs to the Board as well as to periodically investigate, or cause independent investigation of, those records and reports;

(e)     maintain and implement an adequate and functioning system of internal controls so OPKO's operations would comply with all applicable laws;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)      refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)      examine and evaluate any reports of examinations, audits, or other information concerning the affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

57.      Furthermore, the Individual Defendants owed to OPKO, and OPKO's shareholders, the duty of loyalty. This duty requires that each favor OPKO's interest and that of its shareholders over their own and refrain from using their position within the Company for personal advantage.

58.      At all relevant times, the Individual Defendants were the agents of each other and of OPKO and were acting within the course and scope of such agency.

59.      The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by OPKO.

## OPKO'S CODE OF CONDUCT AND GOVERNANCE

### *OPKO's Code of Conduct*

60.      The Company's Code of Conduct, states that it, "applies to OPKO Health Inc. and its subsidiaries and affiliates and their Directors, full-time and part-time employees, contractors and temporary workers."

61.      The Company's Code of Conduct further states, in relevant part, "[y]ou must understand and always comply with any and all laws, rules, regulations and ethical codes that apply to your job function. OPKO's Code of Conduct, policies, procedures, and trainings encapsulate applicable laws, rules, regulations, and ethical codes that pertain to your job."

62.     The Company's Code of Conduct also states that "[w]hen making decisions you must ensure you can truthfully say "yes" to each of [the following] questions: [(1)] Is my decision and resulting action legal? [(2)] Does it comply with OPKO's Code of Conduct? [(3)] Is it permitted by our policies and procedures? [(4)] Could it have negative consequences for OPKO or myself? [(5)] Would I be comfortable if it was reported in a newspaper?"

63.     In a section titled, "Speak Up," the Company's Code of Conduct states, in relevant part, that "… all Code violations must never be ignored…" and that "[i]f you suspect a violation of law, OPKO's Code of Conduct, or OPKO's Policies or Procedures, you have a duty to report this suspected violation to your supervisor."

64.     In a section titled, "Create and Maintain a Healthy Work Place," the Code of Conduct states the following:

> Individual dignity and autonomy must be respected and safeguarded. Harassment, intimidation, bullying and/or discrimination is not tolerated. Employment decisions affecting individuals must be predicated on individual performance and ability - not factors like race, color, gender, religion, politics, age, national origin, disability, marital status, pregnancy, veteran status, sexual orientation or other factors irrelevant to individual capability.

> Everyone owns workplace safety and must observe safe work practices by understanding and obeying posted warnings, signs, policies, procedures and trainings. Immediately report workplace injuries, activities or conditions that could pose a threat to OPKO employees, individuals working on behalf of OPKO, and anyone visiting OPKO workplace facilities. OPKO prohibits the use of illegal drugs, misuse of alcohol and other legal substances, and weapons at its workplaces.

65.     In a section titled, "Ensure Quality, the Code of Conduct also states, in relevant part, "[y]ou must work with your supervisor to understand all Quality, legal, compliance, regulatory and industry standard requirements pertaining to your job."

66.     In a section titled, "Avoid Conflicts of Interest," the Code of Conduct states that, "OPKO personnel must not put themselves in situations where their own financial or personnel interest conflicts with their ability to act in the best interest of OPKO."

67.     In a section titled "Reporting of Code Violations," the Code of Conduct states, in relevant part, that "[f]ailure to report a violation or suspected violation of this code can result in disciplinary action by OPKO, including termination of employment and business relationships" and that "[u]pon receipt of a report of a suspected violation, OPKO Compliance will launch a prompt and thorough investigation."

### *Corporate Governance and Nominating Committee Charter*

68.     The Corporate Governance and Nominating Committee Charter provides that part of the Committees job is: "1. to identify individuals qualified to become members of the Board of Directors, consistent with criteria approved by the Board of Directors; 2. to select the director nominees for the next annual meeting of stockholders or special meeting of stockholders at which directors are to be elected; 3. to recommend candidates to fill any vacancies on the Board of Directors; and 4. to oversee the evaluation of the Board of Directors and management."

69.     Moreover, in a section titled "Duties and Responsibilities," the Corporate Governance and Nominating Committee Charter states,

> 1. <u>Director Identification</u>. The Committee shall identify individuals qualified to become Board of Directors members, consistent with criteria approved by the Board of Directors.
>
> 2. <u>Director Selection and/or Recommendation</u>. The Committee shall have the sole responsibility to make formal recommendations to the Board of new Board candidates…

### *Succession Planning Committee Charter*

70. The Charter of the Succession Planning Committee provides that the committee's purposes is to "assist the Board in the performance of its responsibilities relating to succession planning for the [CEO] and other members of senior management."

71. Pursuant to its charter, the Succession Planning Committee's responsibilities include:

1. Establish[ing] and review[ing] the overall succession planning process and philosophy of the Company, including emergency succession plans relating to the CEO and other members of senior management.
2. Develop[ing] Company goals and objectives relevant to succession planning for the CEO and other senior management roles.
3. [Collaborating] with the Chairman/CEO, develop a CEO candidate or senior management candidate profile and qualifications (including experience, competencies and personal characteristics) to meet the leadership needs of the Company, taking into account the Company's strategic plans as in effect from time to time.
4. Evaluate[ing] potential internal and external candidates for CEO and senior management positions.

\* \* \*

6. Recommend[ing] to the Board one or more candidates for the positions of CEO and   other senior management roles.

### *Audit Committee Charter*

72. The Audit Committee Charter states that the Audit' Committee's purpose is, *inter alia*: "1. to oversee the accounting and financial reporting processes of the Company and the audits of the financial statements of the Company; 2. to assist the Board of Directors' oversight of: a. the integrity of the Company's financial statements; b. the Company's compliance with legal and regulatory requirements; c. the independent auditor's qualifications and independence; and d. the performance of the Company's internal audit function and independent auditors."

73. In a section titled, "Responsibilities," the Audit Committee Charter states the following, in relevant part:

The Committee shall be directly responsible for the appointment, compensation, retention and oversight of the work of any independent auditor (including resolution of disagreements between management and the auditor regarding financial reporting) for the purpose of preparing or issuing an audit report or performing other audit, review or attest services for the Company, and each such independent auditor must report directly to the Committee.

\* \* \*

Risk Oversight. The Committee shall periodically:

a. review risks relating to the financial statements, auditing and financial reporting process, key credit risks, liquidity risks and market risks and inquire of management, the members of the internal audit department and the independent auditors about the Company's major financial and auditing risks or exposures;

b. discuss the steps management has taken to monitor and control such exposures;

c. discuss policies with respect to risk assessment and risk management; and

d. report the results of such review to the full Board of Directors.

Meetings with Management, Internal Auditors and Independent Auditors; Audit Problems. The Committee shall meet separately from time to time with management, the independent auditor, and the internal auditor (or those responsible for the internal audit function) to discuss issues and concerns warranting Committee attention. The Committee shall review with the independent auditor any problems or difficulties and management's response. The review should also include discussion of the responsibilities, budget and staffing of the Company's internal audit function.

\* \* \*

Review of Controls. The Committee shall make or cause to be made, from time to time, such other examinations or reviews as the Committee may deem advisable with respect to the adequacy of the systems of internal controls and accounting practices of the Company and its subsidiaries and with respect to current accounting trends and developments, and take such action with respect thereto as may be deemed appropriate.

Discussion of Controls. The Committee shall discuss with management and the independent auditor the adequacy and effectiveness of the Company accounting and financial controls, including (a) any significant deficiencies in the design and operation of internal controls which could adversely affect the Company's ability to record, process, summarize and report financial data, as well as any material weaknesses in internal controls and (b) any fraud, whether or not material, that

involves the Company's management or other employees who have significant role in the Company's internal controls.

74.     In blatant violation of the Code of Conduct and OPKO's other corporate governance policies, the Individual Defendants engaged in or permitted the Discriminatory Misconduct. The Discriminatory Misconduct was not only a clear breach of the Company's policies but was also illegal under state and federal laws. Further, the Individual Defendants violated the Code of Conduct by causing the Company to engage in the scheme to issue materially false and misleading statements and omissions to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty and violations of the Exchange Act, and failing to report the same.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

75.     OPKO purports to be a diversified healthcare company which seeks to establish industry-leading positions in large and rapidly growing medical markets. The Company engages in both the diagnostics and pharmaceuticals business. OPKO's diagnostics business includes BioReference— a wholly-owned subsidiary and one of the nation's largest full-service laboratories with a core genetic testing business. OPKO's pharmaceutical business features treatment for various diseases.

76.     OPKO is a healthcare company that invests in and acquires other healthcare companies, in addition to developing its own products. As stated by Oracle Partners' Larry

Feinberg, Defendant Frost "views OPKO as his holding company. It is his Berkshire Hathaway of health care."[2]

### **The Discriminatory Misconduct**

77.     During the Relevant Period, the Individual Defendants allowed multiple violations of OPKO's corporate governance policies to occur that injured the Company. These violations included, but were not limited to, engaging in or allowing the Discriminatory Misconduct and engaging in or allowing widespread violations of the Company's Code of Conduct.

78.     On July 16, 2019, BioReference was named as a defendant in a lawsuit filed in the United States District Court for the Northern District of New York (the "Civil Rights Action") which, *inter alia*, alleged "discrimination" and "harassment" based on "race." This lawsuit, which BioReference agreed to settle on in November 2020, was the result of the Individual Defendants' perpetuation of and failure to prevent the Discriminatory Misconduct.

#### *Recent Social Justice Corporate Initiatives*

79.     While the Individual Defendants have caused OPKO to adopt discriminatory policies and fail to keep up with the times, the rest of corporate America has been publicly condemning racism as well as implementing social justice initiatives at a rapid pace. These efforts have been taken to combat systemic racism in America and respond to public outrage over the murders of, among many others, George Floyd, Breonna Taylor, and Ahmaud Arbery.[3] For instance: (1) Microsoft, Intel, and Johnson & Johnson have pledged to tie executive pay to certain diversity figures; (2) Google has pledged to increase the representations of Black and other

---

[2]  Matt Schifrin, *Meet Miami's Renaissance Billionaire*, FORBES (Jan. 24, 2017), https://www.forbes.com/sites/schifrin/2017/01/03/meet-miamis-renaissance-billionaire/#b47517f7306b. Last visited February 24, 2021.

[3]   https://www.forbes.com/sites/davidhessekiel/2020/06/04/companies-taking-a-public-stand-in-the-wake-of-george-floyds-death/?sh=e62ec4172148. Last visited February 24, 2021.

underrepresented groups at senior employment levels 30% by 2025; (3) PepsiCo announced a five-year, $400 million initiative that includes the goal of increasing Black managerial representation by 30% and more than doubling business with Black-owned suppliers; (4) Adidas committed to filling 30% of new positions with Black or Latino workers; and (5) Alexis Ohanian, the co-founder of Reddit, resigned from Reddit's all-Caucasian board, advocated that his seat be filled by a Black individual, and further pledged to use future gains on his Reddit stock to serve the Black community, beginning with Colin Kaepernick's Know Your Rights Camp.

80.     Moreover, within the last year, Goldman Sachs announced that, effective July 1, 2020, the investment bank would refuse to help companies based in the U.S. or Europe that are without at least one "diverse" board member go public. Further, given the research that shows that performance is "significantly better" for companies with at least one diverse board member, David Solomon, Goldman Sachs' CEO, stated that "I think [having a "diverse" board] is the best advice for companies that want to drive premium returns for their shareholders over time."

81.     In blatant contrast, OPKO has refused to offer any sort of showing of solidarity with the Black Lives Matter movement. Instead, the Company has remained noticeably on the sidelines amongst the slew of companies that have pledged to implement changes to increase diversity, particularly Black and Latinx representation, in corporate America.

82.     In fact, on December 1, 2020, the Nasdaq filed a proposal with the SEC which would require all Nasdaq-listed companies to adopt new rules related to board diversity or potentially face delisting. The new rules would require companies to have at least two diverse directors or publicly explain why not.[4] According to *Reuters*, the Nasdaq operator said that "over

---

[4]https://www.nasdaq.com/press-release/nasdaq-to-advance-diversity-through-new-proposed-listing-requirements-2020-12-01. Last visited February 24, 2021.

two dozen studies found an association between diverse boards and better financial performance and corporate governance."[5]

83.     On January 7, 2021, *Bloomberg Law* reported that Facebook and Microsoft announced their support behind the Nasdaq's diversity plan, urging the SEC to approve the proposal to increase diversity on corporate boards.

84.     Also, on February 23, 2021, New Jersey Senator Bob Menendez reintroduced a bill, which also has a companion bill in the U.S. House of Representatives, that would boost SEC disclosure rules by extending reporting requirements on the race, ethnicity, gender, and veteran-status of directors and senior leadership. Notably, the U.S. Chamber of Commerce, the Financial Services Forum, and The Real Estate Roundtable have issued public support for the bill.

85.     Goldman Sachs' recent policy change, the Nasdaq's recent proposal, and the U.S. legislature's actions only serve to emphasize the importance of board diversity and compliance with antidiscrimination policies to maximize shareholder value and investor protection and also to improve corporate decision making and a board's ability to effectively monitor management. These market changes highlight the significance of OPKO's lack of diversity on its Board resulting from the Discriminatory Misconduct.

### *Lack of Meaningful Diversity at the Company*

86.     OPKO is on a shrinking list[6] of publicly traded companies in the United States with exactly *zero* Black, Latinx, or other racially underrepresented individuals on its Board, or Black individuals amongst the ranks of its executive management team. The lack of diversity on the

---

[5] https://www.reuters.com/article/us-nasdaq-sec-diversity/nasdaq-proposes-board-diversity-requirement-for-listed-companies-idUSKBN28B58Q. Last visited February 24, 2021.
[6] In 2019, a record 59% of the directors added to the boards of S&P 500 companies were men belonging to a racial or ethnic minority group or women.

Company's Board and executive management team is the result of OPKO's failure to abide by its antidiscrimination governance policies due to the Discriminatory Misconduct. This failure is demonstrated by such a clear and disproportionate disparity in representation and lack of a diverse and inclusive corporate culture in which Black, Latinx, and other underrepresented individuals have the same opportunities as others within the Company (and within its subsidiaries).

87.     The Company's Board assumes accountability for confirming that OPKO follows federal and state laws that prohibit racial discrimination. While diversity is a strong indication of a lack of discrimination, a lack of diversity is a compelling signal that the Company does, in fact, discriminate. Here, not one member of the Company's twelve-person Board is Black or Latinx and not one member of the Company's thirteen-person executive management team is Black. Instead, the overwhelming majority are, in fact, White men.

88.     Regarding OPKO's corporate culture, the Company has received numerous complaints regarding the lack of room for growth based on merit via reviews left by former and current employees of OPKO on websites such as Niche, Glassdoor, and Indeed. For instance, employee reviews have stated the following:

| PLATFORM & DATE | EMPLOYEE REVIEW |
| --- | --- |
| Glassdoor, March 4, 2018 | "They pick people with less experience to lead because they are like[d] by Management ONLY." |
| Niche, May 30, 2018 | Referring to BioReference, "[t]here should be more room for growth, many positions are filled based on who you know or who you are related to." |
| Indeed, December 18, 2018 | "The management is not focus[ed] [o]n the welfare of their employees. Not a good culture…" |

89.     For years, the Individual Defendants have been aware that OPKO has been violating federal and state laws in connection with the Company's lack of diversity and

Discriminatory Misconduct and yet the Individual Defendants have repeatedly refused to nominate, appoint, or hire a Black, Latinx, other underrepresented minority individuals to the Board or Black individuals to the executive team.

### *Lack of Term Limits as Cause for Concern and Method to Discriminate*

90.     According to a report by the Harvard Law School Forum on Corporate Governance, longer-tenured directors do not serve the best interests of the Company. The report stated the following, in relevant part:

> Investor respondents to ISS' 2016–2017 Global Policy Survey (conducted between Aug. 2, 2016 and Aug. 30, 2016) were asked which tenure-related factors — with multiple answers allowed — would give rise to concern about a board's nominating and refreshment processes. ***Among the 120 institutional investors*** (***one-third of whom each own or manage assets in excess of $100 billion***) ***who responded, 68 percent pointed to a high proportion of directors with long tenure as cause for concern***, ***53 percent identified an absence of newly-appointed independent directors in recent years as a potential problem, and 51 percent flagged lengthy average tenure as problematic***. Just 11 percent of the investor respondents said that tenure is not a concern, although even several of those respondents indicated that an absence of newly-appointed directors is a concern.

(Emphasis added.)

91.     Upon information and belief, the Company does not limit the number of consecutive terms that a director is able to serve on the Board. For example: (i) Defendant Paganelli has served on the Board for approximately 18 years; (ii) Defendants Frost, Hsiao, Rubin, and Lerner have served on the Board for approximately 14 years; and (iii) Defendant Pfenniger has served on the Board for approximately 13 years. As these examples illustrate, the Corporate Governance and Nominating Committee seems to prize incumbency above all other factors when selecting directors. Contrary to any supposed benefit upon which the Company's antiquated policy is based upon, the benefit to the Company from nominating and electing new directors with new ideas and viewpoints from individuals with diverse backgrounds on the Board far outweigh any

potential drawback of losing a longstanding director. Longstanding directors are less likely to ask tough questions and challenge proposals of management and fellow directors, given their long-tenure and personal or professional relationships with executive officers and other directors. In fact, new, diverse directors not only have been found to bring a diversity of opinions and philosophy to the board, but also a diversity of behavior, i.e., a willingness to challenge management and other directors which generates better fact-based decision making. Thus, the Individual Defendants breached their fiduciary duties to the Company by failing to implement term limits in an effort to maintain control of the Company by avoiding the addition of diverse candidates to the Board to the detriment of the Company.

### The Individual Defendants Have Breached Their Duties by Continually Re-Hiring E&Y as the Company's Auditor Even Though E&Y Has Failed to Perform its Job

92.     E&Y labelled the Company's internal controls as adequate, year after year, even as the Company continued including false and misleading statements and omissions in the proxy statements detailed below. Despite this, the Board, and in particular the Audit Committee, continued to vouch for, *inter alia*, the adequacy of the Company's internal controls, the performance of E&Y as independent auditor, and E&Y's independence. However, E&Y has been the Company's independent auditor since 2001 during which time the Company has paid E&Y multiple millions of dollars, including nearly $4.0 million for fiscal year 2019 and over $3.3 million for fiscal year 2018. The duration of this relationship, E&Y's interest in continuing to receive such large fees, and the ongoing failure of E&Y to properly audit and assess the Company's inadequate internal controls demonstrate its lack of independence and failure to effectively perform its role. The Audit Committee Defendants (defined below) are responsible for selecting and monitoring E&Y and have therefore breached their fiduciary duty by failing to ensure that an adequate audit was being performed of the Company's internal controls regarding diversity and

antidiscrimination. The Board's, and the Audit Committee's, continued nomination of E&Y to this role is thus a breach of the Individual Defendant's fiduciary duties.

### False and Misleading Proxy Statements

#### *April 30, 2018 Proxy Statement*

93.     On April 30, 2018, the Company filed a Schedule 14A filed with the SEC (the "2018 Proxy Statement"). The 2018 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act was solicited by Defendants Frost, Hsiao, Rubin, Fishel, Krasno, Lerner, Paganelli, Pfenniger, and Yu, and contained material misstatements and omissions relating to the Discriminatory Misconduct.[7]

94.     The 2018 Proxy Statement also contained proposals to be voted on by shareholders including: (1) the election or re-election of Defendants Frost, Hsiao, Rubin, Fishel, Krasno, Lerner, Paganelli, Pfenniger, and Yu to the Board; (2) a non-binding advisory vote to approve the compensation paid to the Company's named executive officers; and (3) the ratification of E&Y as the Company's independent auditor for fiscal year ended December 31, 2018.

95.     The 2018 Proxy Statement was false and misleading because, despite noting that the Company "has adopted a Code of Business Conduct and Ethics that applies to all employees, officers, and directors of the Company" the Code of Conduct was not followed, as evidenced by the Discriminatory Misconduct and the Individual Defendants' failures to report violations of the Code of Conduct.

---

[7] Plaintiffs' allegations with respect to the misleading statements in the 2018 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiffs specifically disclaim any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

96.     The 2018 Proxy Statement stated, in relevant part, "the Board believes it is important for the Board to have diversity of knowledge base, professional experience and skills, and the Corporate Governance and Nominating Committee takes these qualities into account when considering director nominees for recommendation to the Board."

97.     The statements contained in the 2018 Proxy Statement were materially false and misleading since the Board failed to disclose, *inter alia*, that the Individual Defendants, and particularly, the Corporate Governance and Nominating Committee were engaging in the Discriminatory Misconduct. Despite allegedly cultivating a board with diversity of "knowledge," "experience," and "skills," the truth is that OPKO had no Black, Latinx, or other underrepresented ethnic minority members standing for election or re-election on its Board, thereby inherently limiting the Board's diversity of knowledge, experience, and skills, and that OPKO had no Black members in its executive management team.

98.     The Individual Defendants' failure to add Black, Latinx, or other underrepresented individuals to OPKO's Board and also Black individuals to the Company's executive management team, as well as, upon information and belief, embrace director term limits, reflect explicit or implicit racism and bias at the Company, and is de facto improper cause for failing to add Black, Latinx, or other underrepresented individuals as members of the Company's Board and Black individuals to the Company's executive management team.

99.     The 2018 Proxy Statement also failed to disclose that the Company's internal controls were inadequate to protect Black, Latinx, and other underrepresented individuals from discrimination in OPKO's Board nomination process and Black individuals from OPKO's appointment process to the Company's executive management team. Moreover, the 2018 Proxy Statement failed to disclose that the Individual Defendants failed to maintain internal controls to

ensure that the Company's policies regarding diversity and providing a workplace free of discrimination were being complied with.

100.    The 2018 Proxy Statement also failed to disclose, *inter alia*, that: (1) the Discriminatory Misconduct; (2) upon information and belief, the Company does not have term limits due to a desire to keep Black, Latinx, and other underrepresented individuals off of the Board; (3) the independent auditor the Company repeatedly reselected to evaluate its internal controls was neither independent nor effective at ensuring the adequacy of the Company's internal controls; and (4) the Company failed to maintain adequate internal controls. As a result of the material misstatements and omissions contained in the 2018 Proxy Statement, Company shareholders, *inter alia*, elected Defendants Frost, Hsiao, Rubin, Fishel, Krasno, Lerner, Paganelli, Pfenniger, and Yu, and *zero* Black or Latinx individuals, to the Board, which allowed the illegal and discriminatory practices to continue. Shareholders further ratified E&Y, who was not independent and had failed to identify the inadequate internal controls to protect Black, Latinx, and other underrepresented minorities from discrimination, as the Company's independent auditor for fiscal year ended December 31, 2018.

### *April 26, 2019 Proxy Statement*

101.    On April 26, 2019, the Company filed a Schedule 14A filed with the SEC (the "2019 Proxy Statement"). They 2019 Proxy Statement was solicited by Defendants Frost, Hsiao, Rubin, Fishel, Krasno, Lerner, Paganelli, Pfenniger, and Yu and contained material misstatements and omissions.[8]

---

[8] Plaintiffs' allegations with respect to the misleading statements in the 2019 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiffs specifically disclaim any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

102.     The 2019 Proxy Statement also contained proposals to be voted on by shareholders including: (1) the election or re-election Defendants Frost, Hsiao, Rubin, Fishel, Krasno, Lerner, Paganelli, Pfenniger, and Yu to the Board; (2) to approve an amendment to the Company's amended and restated certificate of incorporation to increase the number of authorized shares of the common stock that may be issued from 750 million shares to 1 billion shares (the "Amendment Proposal"); and (3) a non-binding advisory vote to approve the compensation paid to the Company's named executive officers; and (4) the ratification of E&Y as the Company's independent auditor for fiscal year ended December 31, 2019.

103.     The 2019 Proxy Statement was false and misleading because, despite noting that the Company "has adopted a Code of Business Conduct and Ethics that applies to all employees, officers, and directors of the Company" the Code of Conduct was not followed, as evidenced by the Discriminatory Misconduct and the Individual Defendants' failures to report violations of the Code of Conduct.

104.     The 2019 Proxy Statement stated, in relevant part, "the Board believes it is important for the Board to have diversity of knowledge base, professional experience and skills, and the Corporate Governance and Nominating Committee takes these qualities into account when considering director nominees for recommendation to the Board."

105.     The statements contained in the 2019 Proxy Statement were materially false and misleading since the Board failed to disclose, *inter alia*, that the Individual Defendants, and particularly, the Corporate Governance and Nominating Committee were engaging in the Discriminatory Misconduct. Despite allegedly cultivating a board with diversity of "knowledge," "experience," and "skills," the truth is that OPKO had no Black, Latinx, or other underrepresented ethnic minority members standing for election or re-election on its Board, thereby inherently

limiting the Board's diversity of knowledge, experience, and skills, and that OPKO had no Black members in its executive management team.

106. The Individual Defendants' failure to add Black, Latinx, or other underrepresented individuals to OPKO's Board and also Black individuals to the Company's executive management team, as well as, upon information and belief, embrace director term limits, reflect explicit or implicit racism and bias at the Company, and is de facto improper cause for failing to add Black, Latinx, or other underrepresented individuals as members of the Company's Board and Black individuals to the Company's executive management team.

107. The 2019 Proxy Statement also failed to disclose that the Company's internal controls were inadequate to protect Black, Latinx, and other underrepresented individuals from discrimination in OPKO's Board nomination process and Black individuals from OPKO's appointment process to the Company's executive management team. Moreover, the 2019 Proxy Statement failed to disclose that the Individual Defendants failed to maintain internal controls to ensure that the Company's policies regarding diversity and providing a workplace free of discrimination were being complied with.

108. The 2019 Proxy Statement also failed to disclose, *inter alia*, that: (1) the Discriminatory Misconduct; (2) upon information and belief, the Company does not have term limits due to a desire to keep Black, Latinx, and other underrepresented individuals off of the Board; (3) the independent auditor the Company repeatedly reselected to evaluate its internal controls was neither independent nor effective at ensuring the adequacy of the Company's internal controls; and (4) the Company failed to maintain adequate internal controls. As a result of the material misstatements and omissions contained in the 2019 Proxy Statement, Company shareholders, *inter alia*, elected Defendants Frost, Hsiao, Rubin, Fishel, Krasno, Lerner, Paganelli,

Pfenniger, and Yu, and zero Black or Latinx individuals, to the Board, which allowed the illegal and discriminatory practices to continue, approved the Amendment Proposal, and ratified E&Y as the Company's independent auditor for fiscal year ended December 31, 2019.

### April 29, 2020 Proxy Statement

109.    On April 29, 2020, the Company filed the 2020 Proxy Statement. The 2020 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act was solicited by Defendants Frost, Hsiao, Rubin, Fishel, Krasno, Lerner, Paganelli, Pfenniger, and Yu, and contained material misstatements and omissions relating to the Discriminatory Misconduct.[9]

110.    The 2020 Proxy Statement also contained proposals to be voted on by shareholders including: (1) the election or re-election of Defendants Frost, Hsiao, Rubin, Fishel, Krasno, Lerner, Paganelli, Pfenniger, and Yu to the Board; (2) a non-binding advisory vote to approve the compensation paid to the Company's named executive officers; and (3) the ratification of E&Y as the Company's independent auditor for fiscal year ended December 31, 2020.

111.    The 2020 Proxy Statement was false and misleading because, despite noting that the Company "has adopted a Code of Business Conduct and Ethics that applies to all employees, officers, and directors of the Company" the Code of Conduct was not followed, as evidenced by the Discriminatory Misconduct and the Individual Defendants' failures to report violations of the Code of Conduct.

112.    The 2020 Proxy Statement stated, in relevant part, "the Board believes it is important for the Board to have diversity of knowledge base, professional experience and skills,

---

[9] Plaintiffs' allegations with respect to the misleading statements in the 2020 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiffs specifically disclaim any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

and the Corporate Governance and Nominating Committee takes these qualities into account when considering director nominees for recommendation to the Board."

113.     The statements contained in the 2020 Proxy Statement were materially false and misleading since the Board failed to disclose, *inter alia*, that the Individual Defendants, and particularly, the Corporate Governance and Nominating Committee were engaging in the Discriminatory Misconduct. Despite allegedly cultivating a board with diversity of "knowledge," "experience," and "skills," the truth is that OPKO had no Black, Latinx, or other underrepresented ethnic minority members standing for election or re-election on its Board, thereby inherently limiting the Board's diversity of knowledge, experience, and skills, and that OPKO had no Black members in its executive management team.

114.     The Individual Defendants' failure to add Black, Latinx, or other underrepresented individuals to OPKO's Board and also Black individuals to the Company's executive management team, as well as, upon information and belief, embrace director term limits, reflect explicit or implicit racism and bias at the Company, and is de facto improper cause for failing to add Black, Latinx, or other underrepresented individuals as members of the Company's Board and Black individuals to the Company's executive management team.

115.     The 2020 Proxy Statement also failed to disclose that the Company's internal controls were inadequate to protect Black, Latinx, and other underrepresented individuals from discrimination in OPKO's Board nomination process and Black individuals from OPKO's appointment process to the Company's executive management team. Moreover, the 2020 Proxy Statement failed to disclose that the Individual Defendants failed to maintain internal controls to ensure that the Company's policies regarding diversity and providing a workplace free of discrimination were being complied with.

116.    The 2020 Proxy Statement also failed to disclose, *inter alia*, that: (1) the Discriminatory Misconduct; (2) upon information and belief, the Company does not have term limits due to a desire to keep Black, Latinx, and other underrepresented individuals off of the Board; (3) the independent auditor the Company repeatedly reselected to evaluate its internal controls was neither independent nor effective at ensuring the adequacy of the Company's internal controls; and (4) the Company failed to maintain adequate internal controls. As a result of the material misstatements and omissions contained in the 2020 Proxy Statement, Company shareholders, *inter alia*, elected Defendants Frost, Hsiao, Rubin, Fishel, Krasno, Lerner, Paganelli, Pfenniger, and Yu, and zero Black or Latinx individuals, to the Board, which allowed the illegal and discriminatory practices to continue, ratified E&Y as the Company's independent auditor for fiscal year ended December 31, 2020.

## DAMAGES TO OPKO

117.    As a direct and proximate result of the Individual Defendants' conduct, OPKO has lost and expended, and will lose and expend, many millions of dollars.

118.    Such expenditures include, but are not limited to, legal fees and other costs of defending any potential investigations of and/or lawsuits related to the Discriminatory Misconduct, including but not limited to the Civil Rights Action, for the Company's loss of profits caused by the Discriminatory Misconduct, and the loss of talent due to the Company's engagement in the Discriminatory Misconduct.

119.    Moreover, these expenditures include fees paid to E&Y for its independent auditing services, when it was not independent and when it provided inadequate services considering the ongoing failure to identify the inadequate internal controls and to prevent false and misleading statements to be included in the Company's SEC filings.

120.    OPKO has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Individual Defendants' breaches of fiduciary duties and violations of the Exchange Act.

## DERIVATIVE ALLEGATIONS

121.    Plaintiffs bring this action derivatively, for the benefit of OPKO, to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as controlling shareholders, directors and/or officers of OPKO and violations of the Exchange Act as well as their aiding and abetting of this misconduct.

122.    OPKO is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

123.    Plaintiffs are, and have continuously been at all relevant times, shareholders of OPKO. Plaintiffs will adequately and fairly represent the interests of OPKO, and have retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

124.    A pre-suit demand on the Board of OPKO is futile and, thus, excused. At the time of filing of this action, the Board consists of the following twelve individuals: Defendants Frost, Hsiao, Rubin, Fishel, Krasno, Lerner, Paganelli, Pfenniger, and Yu (the "Director-Defendants") and non-parties Cohen, Medel, and Lachman (together with the Director-Defendants, the "Directors"). Plaintiffs only need to allege demand futility as to six of the twelve Directors on the Board at the time this action was commenced.

125.    Demand is excused as to all of the Director-Defendants because each one of them faces a substantial likelihood of liability as a result of the scheme they engaged in, knowingly or recklessly, which caused the Company to make false and misleading statements in the 2018, 2019,

and 2020 Proxy Statements (the "Proxy Statements"), which failed to disclose: (1) the Discriminatory Misconduct; (2) upon information and belief, the Company does not have term limits due to a desire to keep Black, Latinx, and other underrepresented individuals off of the Board; (3) the independent auditor the Company repeatedly reselected to evaluate its internal controls was neither independent nor effective at ensuring the adequacy of the Company's internal controls; and (4) the Company failed to maintain adequate internal controls. This fact renders the Director-Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

126.    Demand is also excused as to all the Director-Defendants because the Discriminatory Misconduct was an unlawful business strategy that the Company engaged in and was not a valid exercise of business judgment. As the ultimate decision-making body of the Company, the Board made and/or allowed the Company to engage in the schemes outlined herein.

127.    In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly caused the Company to engage in the discrimination which formed the basis of the false and misleading statements, to engage in the scheme to make false and misleading statements about the discrimination at the Company, to repeatedly reselect E&Y as the Company's independent auditor even though E&Y was neither independent nor effective at ensuring the adequacy of the Company's internal controls, and to fail to maintain internal controls. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

128.    Demand is excused as to the Director-Defendants because they were fully aware of the Discriminatory Misconduct throughout the Relevant Period. Nonetheless, the Director-Defendants knowingly engaged in or permitted and/or caused the Discriminatory Misconduct and

caused the Company to engage in the Discriminatory Misconduct and also disseminate the false and misleading statements and omissions related thereto as described herein. Thus, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

129.    Additional reasons that demand on Defendant Frost is futile follow. Defendant Frost has served as a director and as the Company's CEO and Chairman since March 2007. Defendant Frost beneficially owned 229,017,822 shares of the Company's common stock, which represented 33.86% of the Company's outstanding common stock as of April 27, 2020, rendering him a controlling shareholder of OPKO. Therefore, as the Company admits, he is a non-independent director. The Company provides Defendant Frost with his principal occupation, and he has received and continues to receive substantial compensation, including $1,405,200 and $2,036,000 during the fiscal years ended December 31, 2019 and 2018, respectively. Defendant Frost, as CEO, was ultimately responsible for the false and misleading statements and omissions that were made in the Proxy Statements, all of which he solicited as a member of the Board. As the Company's highest officer and as a trusted Company director, he conducted little, if any, oversight of the Discriminatory Misconduct (which Defendant Frost engaged in and permitted despite being aware of it) or the Company's engagement in the scheme to issue false and misleading statements, and consciously disregarded his duties to monitor internal controls over engagement in the scheme.

130.    Moreover, as noted in the 2020 Proxy Statement, OPKO engages in a number of ongoing transactions with entities associated with Defendant Frost. For example: (1) on February 25, 2020, the Company entered into a credit agreement with an affiliate of Defendant Frost, pursuant to which the lender committed to provide the Company with an unsecured line of credit in the amount of $100 million at an 11% interest rate per annum, maturing on February 25, 2025;

(2) on November 8, 2018, the Company entered into a credit agreement with an affiliate of Defendant Frost, pursuant to which the lender committed to provide the Company with an unsecured line of credit in the amount of $60 million at a 10% interest rate per annum which would have matured on November 8, 2023 but for the Company's premature termination of the line of credit on February 20, 2019; (3) OPKO has indirectly paid Frost approximately millions in rent during the Relevant Period and approximately $927,000 over the past three fiscal years for air travel;[10] (4) in November 2016, OPKO entered into a Pledge Agreement with the Frost Science Museum pursuant to which OPKO agreed to contribute an aggregate of $1.0 million over a four-year period for constructing, equipping and the general operation of the Frost Science Museum; and (5) in January 2014, the Company entered into a lease agreement with Frost Real Estate, a Company owned by Defendant Frost for the rental of office space.[11] Therefore, Defendant Frost breached his fiduciary duties, he faces a substantial likelihood of liability, he is not independent or disinterested, and demand upon him is futile and excused

131.    Several of the Director-Defendants are also entwined with Defendant Frost through various connections and transactions. These connections include but are not limited to the following:

---

[10] The Company uses an airplane owned by a company beneficially owned by Defendant Frost, for which that company is reimbursed. The Company paid approximately $328,000, $238,000, and $361,000 in fiscal years 2019, 2018, and 2017, respectively for the use of the private plane.

[11] A five-year lease between the Company and Frost Real Estate, entered into January 1, 2014, pursuant to which the Company initially paid $81,000 per month for approximately 29,000 square feet of office space. Beginning in 2018 and running into 2019, the rent increased to $86,000 per month. Effective August 1, 2019, the Company entered an amendment to the lease which provides for rental payments of $89,000 per month in the first year increasing annually to $101,000 per month in the fifth year.

*Neovasc Inc. ("Neovasc")*

132.    On August 17, 2011, OPKO invested $2 million in Neovasc, which was 36% owned by Defendant Frost. In exchange for this investment, OPKO received 2 million shares of common stock and 1 million two-year warrants. OPKO also entered into a consulting agreement with Neovasc in exchange for an option to purchase 913,750 additional shares of common stock. As of August 4, 2011, Defendant Frost approximately owned 36%, Defendant Hsiao owned approximately 6%, and Defendant Rubin less than 1% of Neovasc.

*RXi Pharmaceuticals Corporation*

133.    In March 2013, OPKO entered into an Asset Purchase Agreement and a Stock Purchase Agreement with RXi Pharmaceuticals Corporation ("RXi"). In exchange, RXi agreed to issue RXi stock worth an aggregate of at least $10 million to OPKO and "certain accredited investors"; OPKO invested $2.5 million; FGIT invested $1,000,000, and Defendant Rubin invested $30,000. OPKO then invested another $200,000 in December 2016. As of December 31, 2017, the Company had an approximate 2.8% beneficial ownership interest in RXi.

*Zebra Biologic, Inc. ("Zebra")*

134.    In October 2013, the Company made an investment in Zebra, a privately held biotechnology company co-founded by Defendants Frost and Lerner. Zebra owned the license for a core technology developed by Defendant Lerner in his laboratory at Scripps. As of December 31, 2019, the Company had an approximate beneficial ownership interest of 29% in Zebra.

*Non-Invasive Monitoring Systems, Inc. ("NIMS")*

135.    OPKO owns 1% of NIMS which leases its 4400 Biscayne Boulevard headquarters from Frost Real Estate. Defendant Hsiao is Chairman and Defendant Rubin is a director of NIMS. Defendant Frost finances NIMS through a series of high-interest (11%) promissory notes with

FGIT. As of October 18, 2020, Defendant Frost, through FGIT, owns 35.3% of NIMS and is its largest stockholder; Defendant Hsiao owns 28.1% and is the second largest stockholder. NIMS has also rented warehouse space in Hialeah, Florida from an entity controlled by Defendants Frost and Hsiao.

136.     These transactions and connections further preclude the Director-Defendants from considering any demand with the requisite level of independence and/or disinterestedness.

137.     Additional reasons that demand on Defendant Hsiao is futile follow. Defendant Hsiao has served as a Company director since February 2007 and as the Company's CTO and Vice-Chairman since May 2007. Defendant Hsiao beneficially owned 35,139,764 shares of the Company's common stock, which represented 5.23% of the Company's outstanding common stock as of April 27, 2020. Therefore, as the Company admits, she is a non-independent director. Defendant Hsiao has received and continues to receive substantial compensation, including $1,345,200 and $1,976,000 during the fiscal years ended December 31, 2019 and 2018, respectively. She is beholden to controlling shareholder and Defendant Frost, as she depends on him for her primary source of livelihood. As Defendant Frost clearly faces a substantial likelihood of liability, demand is futile as to Defendant Hsiao. As the Company's CTO, Vice-Chairman, and as a Company director, she conducted little, if any, oversight of the Discriminatory Misconduct (which Defendant Hsiao engaged in and permitted despite being aware of it) or the Company's engagement in the scheme to issue false and misleading statements, and consciously disregarded her duties to monitor internal controls over engagement in the scheme. She also solicited the Proxy Statements, which contained material misrepresentations and omissions, as alleged herein. Therefore, Defendant Hsiao breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and demand upon her is futile and excused.

138.    Defendant Hsiao also shares a close, decades-long relationship with Defendant Frost which includes multiple companies and philanthropy. In profiling Defendant Hsiao, *Forbes* described Defendant Hsiao as "Frost's close confidante and business partner [who] has been working with him for year[s] at various pharma outfits." In January 2017, *Forbes* reported that Defendant Frost "lunches daily with senior executives, including Dr. Jane Hsiao . . . whose late husband, Charles, cofounded Ivax with Frost."[12] Charles Hsiao worked with Frost at Key Pharmaceuticals and was one of IVAX Corporation ("IVAX")'s first employees.

139.    Moreover, in a conference call held with analysts and investors on March 1, 2018, Defendant Frost touted the confidence that he and Defendant Hsiao had in OPKO, stating his confidence had been confirmed by his "investing an additional $25 million into the Company, alongside my colleague Dr. Jane Hsiao."

140.    These connections extend to shared philanthropic interests as Defendant Hsiao has made contributions to: the Phillip and Patricia Frost Museum of Science which includes the Hsiao Family Special Exhibition Gallery. Further in June 2018, Defendant Hsiao's Jane Hsiao Asian Art Endowment funded an exhibit at the Frost Art Museum at Florida International University, underscoring the depth of her social and professional connections with Defendant Frost.

141.    Defendant Hsiao also served in numerous leadership roles with Defendant Frost-affiliated or Defendant Frost-controlled companies, including:

i)       Director of Cocrystal Pharma, Inc. ("Cocrystal");

ii)      Director and Vice Chairman – Technical Affairs of IVAX from 1995 through 2006, while Defendant Frost was Chairman and CEO of IVAX;

---

[12]  Matt Schifrin, *Meet Miami's Renaissance Billionaire*, FORBES (Jan. 24, 2017), https://www.forbes.com/sites/schifrin/2017/01/03/meet-miamis-renaissance-billionaire/#b47517f7306b.

iii)  Chairman, CEO, and President of IVAX Animal Health, a subsidiary of IVAX, from 1998 through 2006;

iv)  Director of IVAX Diagnostics, a subsidiary of IVAX;

v)  Director of IVAX Pharmaceuticals s.r.o.;

vi)  Vice President of Quality Assurance and Compliance of IVAX Research;

vii)  Director of SafeStitch Medical, Inc. ("SafeStitch") from 2007 until it was merged into TransEnterix, Inc. ("TransEnterix"), on September 3, 2013;

viii)  Director of Asensus Surgical, Inc. (formerly TransEnterix) ("Asensus"), a company Defendant Frost owned 6.5 million shares in as of December 5, 2013, with Defendant Pfenniger;

ix)  Director of Prolor Biotech, Inc. ("Prolor") from 2008 until it was acquired by OPKO in 2013. Prior to the completion of the acquisition of, Prolor, Defendant Frost was a director of Prolor and held Prolor stock directly and through FGIT. The Phillip & Patricia Philanthropic Foundation also held approximately 20.22% of the outstanding shares of Prolor;

x)  Director of Neovasc;

xi)  Member of the Board of Managers of Fabrus, Inc. ("Fabrus") (later acquired by Senesco), where Defendant Frost was also a member of the Board of Managers. Defendant Lerner also beneficially owned 5% of Fabrus at the time OPKO filed its April 26, 2011 proxy solicitation;

xii)  President of Ophthalmic Technologies, Inc., in which OPKO invested $5 million in 2007;

xiii)   President from 2010 to 2011 of Etamota Corporation, which listed an address at the former IVAX Building;

xiv)   Chairman and CEO of NIMS since 2008; and

xv)   Director of Orthodontix Inc. ("Orthodontix"), which merged with Protalix BioTherapeutics Ltd. ("Protalix") in 2006. Protalix is an Israeli company which collaborated with Teva on recombinant plant cell expression technology and which was merged with Orthodontix. Defendant Frost is a stockholder of the combined company and was a large and early investor in Protalix.

142.   Through these Defendant Frost-related positions, Defendant Hsiao held 306,479 shares in Cocrystal as of April 24, 2019, 391,971 shares of Asensus as of April 9, 2020, held 9,861,577 shares of IVAX prior to its acquisition and held 2,288,189 shares of Prolor prior to its acquisition by OPKO and received $70,093 in cash compensation. In total, Defendant Hsiao has earned tens of millions of dollars in compensation from Defendant Frost-related companies.

143.   Additional reasons that demand on Defendant Rubin is futile follow. Defendant Rubin has served as a Company director since February 2007 and as the Company's Executive Vice President – Administration since May 2007. Therefore, as the Company admits, he is a non-independent director. Defendant Rubin has received and continues to receive substantial compensation, including $1,131,200 and $1,460,000 during the fiscal years ended December 31, 2019 and 2018, respectively. He is beholden to controlling shareholder Defendant Frost, as he depends on him for his primary source of livelihood. As Defendant Frost clearly faces a substantial likelihood of liability, demand is futile as to Defendant Rubin. As a Company director, he conducted little, if any, oversight of the Discriminatory Misconduct (which Defendant Rubin engaged in and permitted despite being aware of it) or the Company's engagement in the scheme

to issue false and misleading statements, and consciously disregarded his duties to monitor internal controls over engagement in the scheme. He also solicited the Proxy Statements, which contained material misrepresentations and omissions, as alleged herein. Therefore, Defendant Rubin breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and demand upon him is futile and excused.

144.    Further, Defendant Rubin has strong personal and professional connections with Defendant Frost. In 2017 *Forbes* reported that Defendant Rubin is a "regular lunch mate" of Defendant Frost, and the two men have frequent face to face meetings.[13] Further, Defendant Rubin has been involved in securities violations with Defendant Frost. For example, a class action lawsuit for violations of the securities laws was filed in the Southern District of Florida against Searchmedia Holdings Limited, and Defendants Frost and Rubin (among others) in 2010 and was partially settled in 2013 for consideration of $2.75 million.

145.    Defendant Rubin is also a controlling member of the Frost Group and is so closely connected with the Frost Group that he must disclaim ownership of OPKO shares held by the Frost Group in OPKO's annual proxy statements.

146.    Defendant Rubin has also served in numerous capacities for Defendant Frost-affiliated or Frost-controlled entities, including:

i)      Director of Castle Brands, Inc. ("Castle Brands"), a company in which Defendant Frost beneficially owned roughly 31.8% of the equity as of July 22, 2019;

---

[13] Matt Schifrin, *Meet Miami's Renaissance Billionaire*, FORBES (Jan. 24, 2017), https://www.forbes.com/sites/schifrin/2017/01/03/meet-miamis-renaissance-billionaire/#b47517f7306b.

ii) Interim CEO and Interim CFO and as a member of the board of directors of Tiger X Medical, Inc. ("Tiger X") until its merger with BioCardia, Inc. ("BioCardia") in October 2016;

iii) Advisor to MabVax Therapeutics Holdings, Inc.;

iv) Director of Cocrystal;

v) Senior Vice President, General Counsel and Secretary of IVAX from 2001 to 2006, during Defendant Frost's tenure as CEO;

vi) Director of SafeStitch from 2007 until it merged into TransEnterix on September 3, 2013;

vii) Director of Neovasc;

viii) Director and stockholder of NIMS since 2008, along with Defendant Hsiao, who is Chairman and CEO;

ix) Director of Prolor, from 2008 until it was acquired by OPKO in 2013;

x) Director of Sevion Therapeutics, Inc. ("Sevion"), which renamed itself Eloxx Pharmaceuticals, Inc. ("Eloxx"), starting in 2014-15, in which both OPKO and Defendant Frost have large investments;

xi) Director of SciVac Therapeutics, Inc. ("SciVac") in 2012, after which OPKO made a large investment in the company. SciVac became VBI in 2015. OPKO is now a 17% beneficial owner of VBI;

xii) Director of ChromaDex;

xiii) Board Observer at Arno Therapeutics, Inc. ("Arno");

xiv)   Director and Vice Chairman of Cogint, Inc. ("Cogint" f/k/a IDI, Inc. and Tiger Media, Inc., n/k/a Fluent, Inc.), where Defendant Frost served as vice chairman of the board;

xv)   Director of Dreams, Inc., where Defendant Frost was formerly the third-largest stockholder;

xvi)   Secretary and Director of Ideation Acquisition Corp. of which Defendant Frost was a substantial stockholder and chairman;

xvii)   Member of Supervisory Board of inter CLICK, Inc., in which Defendant Frost invested;

xviii)   Director of Kidville, Inc. ("Kidville"), in which Defendant Frost led a group of investors who made a $10 million investment in which Defendants Rubin and Hsiao participated;

xix)   Director of Longfoot Communications Corp., which acquired Kidville;

xx)   Director of Red Violet, Inc. which was spun-off from Cogint where Defendant Frost also served as a director;

xxi)   Member of Supervisory Board of Teva Czech Industries s.r.o.;

xxii)   Director of Tiger Media, Inc. prior to its acquisition by IDI;

xxiii)   Strategic Advisor at usell.com, Inc., a secondhand phone website in which Defendant Frost invested; and

xxiv)   Registered Agent for Frost Real Estate.

147.   Defendant Frost was Vice Chairman of Cogint from 2015 to March 2018, and its largest stockholder with 24.6% beneficial ownership as of April 24, 2020. Defendant Rubin was a Cogint director from 2009 until March 2018, and served on the Cogint board's audit committee.

For his service on the Cogint board and audit committee, Defendant Rubin received 30,000 restricted stock units ("RSUs") and additional stock awards for his service. As of December 31, 2016, Defendant Rubin held 150,000 shares of Cogint common stock and 32,000 additional shares subject to options awards.

148.     Through these Defendant Frost related positions, Defendant Rubin has earned tens of millions of dollars in compensation from Defendant Frost-related companies.

149.     Additional reasons that demand on Defendant Fishel is futile follow. Defendant Fishel has served as a Company director since April 2018. He also serves as the Chair of the Independent Investment Committee, as a member of the Compensation Committee, and as a member of the Succession Committee. As a Company director, he conducted little, if any, oversight of the Discriminatory Misconduct (which Defendant Fishel engaged in and permitted despite being aware of it) or the Company's engagement in the scheme to issue false and misleading statements, and consciously disregarded his duties to monitor internal controls over engagement in the scheme. He also solicited the 2019 and 2020 Proxy Statements, which contained material misrepresentations and omissions, as alleged herein. Therefore, Defendant Fishel breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and demand upon him is futile and excused.

150.     Additional reasons that demand on Defendant Krasno is futile follow. Defendant Krasno has served as a Company director since February 2017. He also serves as a member of the Audit Committee, as a member of the Compensation Committee, as a member of the Independent Investment Committee, and as a member of the Succession Committee. As a member of the Audit Committee who signed the "Audit Committee Report" contained in each of the Proxy Statements, Defendant Krasno bears responsibility for the failure of the Company to maintain internal controls

and for the repeated appointment of E&Y as independent auditor, when it was neither independent nor effective at ensuring the adequacy of the Company's internal controls. As a Company director, he conducted little, if any, oversight of the Discriminatory Misconduct (which Defendant Krasno engaged in and permitted despite being aware of it) or the Company's engagement in the scheme to issue false and misleading statements, and consciously disregarded his duties to monitor internal controls over engagement in the scheme. He also solicited the Proxy Statements, which contained material misrepresentations and omissions, as alleged herein. He also solicited the Proxy Statements, which contained material misrepresentations and omissions, as alleged herein. Therefore, Defendant Krasno breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and demand upon him is futile and excused.

151. Defendant Krasno is also beholden to Defendant Frost due to their extensive business relationship. Defendant Krasno is or was involved in the following capacities at Defendant Frost-related or Defendant Frost-controlled companies:

i) Defendant Krasno is a director of Ladenburg Thalmann Financial Services Inc. ("Ladenburg Thalmann") and was paid $330,400 in director compensation for the year ending April 30, 2019 and he held roughly 738,917 shares of Ladenburg Thalmann common stock as of December 19, 2019. In the aggregate, Defendant Krasno has been paid millions of dollars in compensation for his years as a Ladenburg Thalmann director;

ii) Defendant Krasno serves alongside Defendants Frost and Rubin as directors of Castle Brands, for which Defendant Krasno has held 180,000 shares as of January 3, 2019 and received $33,350 in compensation for the year ended March 31, 2018;

iii)    Defendant Krasno is a director of BioCardia, for which he has received 38,629 BioCardia shares as of October 31, 2020 and $43,750 in compensation for the year ending December 31, 2019;

iv)    Defendant Krasno was a director at Whitman Education Group, Inc. ("Whitman"), where Defendant Frost served as chairman of the board while owning more than a third of the company's stock. Defendant Krasno also held 82,500 stock of Whitman before it was acquired by Career Education Group in 2003;

v)    Defendant Krasno is a member of the Board of Advisors at the Frost School of Music at the University of Miami, together with Defendant Frost and Patricia Frost; and

vi)    Defendant Krasno is also Executive Director of the William R. Kenan, Jr. Charitable Trust, which has given millions of dollars to the Frost Science Museum, including $2 million in the fiscal year ended June 30, 2015, and president of four affiliated William R. Kenan, Jr. Funds. Indeed, the Frost Science Museum had established a "William R. Kenan, Jr. Charitable Trust Gallery" at the museum.

152.    According to certain Findings of Fact and Conclusions of Law reached in *SEC v. Zachariah, et al.*, No. 08-cv-60698 (S.D. Fla), "Krasno had known Dr. Frost for at least ten years before being invited to join the board of IVAX, was a personal friend of Dr. Frost, and had served on a prior corporate board with him from the mid-1990's until 2004."

153.    In total, Defendant Krasno has earned millions of dollars in compensation from Defendant Frost-related companies. In fact, Defendant Krasno appears to only earn his annual compensation from OPKO and other Defendant Frost-related companies. Thus, he is beholden to

Defendant Frost due to Defendant Frost's control over his sources of livelihood and demand upon him is futile and therefore, excused.

154.    Additional reasons that demand on Defendant Lerner is futile follow. Defendant Lerner has served as a Company director since March 2007. He also serves as the Chair of the Compensation Committee and as a member of the Corporate Governance and Nominating Committee. As a member of the Corporate Governance and Nominating Committee, he bears responsibility for the Company's failure nominate or elect any Black, Latinx, or other underrepresented minority individuals to the Board during the Relevant Period. Defendant Lerner has invested alongside Defendant Frost in several biotech startups and has been the beneficiary of several conflicted related party transactions where OPKO funds were used to further the personal investments of Defendants Frost and Lerner. Although Defendant Lerner is not a direct employee of OPKO, OPKO owns 29% of Zebra, which is a privately held business founded by Defendants Frost and Lerner. As a Company director, he conducted little, if any, oversight of the Discriminatory Misconduct (which Defendant Lerner engaged in and permitted despite being aware of it) or the Company's engagement in the scheme to issue false and misleading statements, and consciously disregarded his duties to monitor internal controls over engagement in the scheme. He also solicited the Proxy Statements, which contained material misrepresentations and omissions, as alleged herein. Therefore, Defendant Lerner breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and demand upon him is futile and excused.

155.    Defendant Lerner also has an extensive business relationship with Defendant Frost and continues to rely on Defendant Frost and OPKO to fund his research at Zebra. Defendant Lerner is a scientific founder of Zebra, a biotechnology company that was co-founded by

Defendant Frost and funded in large part by Defendant Frost and OPKO. Defendant Frost has served as a director of Zebra.

156.    Defendant Frost also served as director, Vice Chairman and Chairman of Teva from 2006 to 2014. Defendant Lerner was a director of Teva from 2012 until 2015. For his work at Teva, Defendant Lerner was paid $190,000 annually plus a per meeting fee of $2,000 and an annual fee of $10,000 for each of his board committee members (of which he had two—Human Resources and Compensation Committee and the Science and Technology Committee). Additionally, Defendant Lerner was paid an annual equity-based award of $130,000 in RSUs following each annual general meeting of stockholders. Accordingly, Defendant Lerner was paid a total of at least $570,000 in annual director compensation, $60,000 for his board committee memberships and $390,000 RSUs while at Teva.

157.    Additionally, Defendant Lerner served as President of The Scripps Research Institute ("Scripps") from 1986 until December 2011 and is currently serving as an institute professor. During that time, Defendant Lerner's compensation at Scripps totaled over $1.2 million in annual salary. Defendant Frost was a member of the Scripps Board of Trustees from 2004 until November 2012 and served on the compensation committee of Scripps from 2011 to 2012. While Defendant Lerner was President of Scripps, Defendant Frost made numerous donations in the millions of dollars to Scripps. Defendant Lerner publicly stated that "[o]ver the years of our expansion into Jupiter, Phil [Frost] has been an invaluable resource as a member of our Board of Trustees, and both he and Patricia [Frost] have been among the strongest supporters of the work we do."

158.    Defendant Lerner has served as a consultant and scientific advisor to Sorrento Therapeutics, Inc. ("Sorrento"), positions he held when OPKO and Defendant Frost invested in

Sorrento on June 10, 2009. He has also served as a member of Scientific Advisory Board of Protalix.

159.    In February 2012, Defendant Lerner invested alongside of OPKO and FGIT in ChromaDex as part of a $3.7 million private placement. Defendant Lerner serves on the scientific advisory board and the board of directors of InterX, Inc. ("InterX"). Defendant Frost also sits on the board of directors of InterX. On its website, InterX touts its connection with Cocrystal. In fact, on September 5, 2017, Cocrystal, InterX, and a third company announced that they had entered into a drug discovery collaboration.

160.    Additional reasons that demand on Defendant Paganelli is futile follow. Defendant Paganelli has served as a Company director since December 2003. He also serves as the Chair of the Corporate Governance and Nominating Committee, as a member of the Audit Committee, and as a member of the Investment Committee. Previously, Defendant Paganelli served as the Company's Interim CEO and Secretary from June 29, 2005 through March 27, 2007, the Company's Interim CFO from June 29, 2005 through July 1, 2005, and Chairman of our Board from December 2003 through March 27, 2007. Defendant Paganelli was also a member of the Company's Business Opportunities Search Committee, which led to his introduction to Defendant Frost and Defendant Frost's ultimate investment in OPKO in 2006. As a result of his service on the Business Opportunities Search Committee in 2007, Defendant Paganelli was awarded 50,000 shares of Company stock. As the Chair of the Corporate Governance and Nominating Committee, he bears responsibility for the Company's failure nominate or elect any Black, Latinx, or other underrepresented minority individuals to the Board during the Relevant Period. Moreover, as a member of the Audit Committee who signed the "Audit Committee Report" contained in each of the Proxy Statements, Defendant Paganelli  bears responsibility for the failure of the Company to

maintain internal controls and for the repeated appointment of E&Y as independent auditor, when it was neither independent nor effective at ensuring the adequacy of the Company's internal controls. Defendant Paganelli has received and continues to receive compensation for his role as a director as described above. As a Company director, he conducted little, if any, oversight of the Discriminatory Misconduct (which Defendant Paganelli engaged in and permitted despite being aware of it) or the Company's engagement in the scheme to issue false and misleading statements, and consciously disregarded his duties to monitor internal controls over engagement in the scheme. He also solicited the Proxy Statements, which contained material misrepresentations and omissions, as alleged herein. Therefore, Defendant Paganelli breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and demand upon him is futile and excused.

161.    Moreover, Defendant Paganelli held 401 shares in Prolor prior to its acquisition by OPKO in August 2013. In total, Paganelli has earned over $1 million in compensation from Defendant Frost related entities.

162.    Additional reasons that demand on Defendant Pfenniger is futile follow. Defendant Pfenniger has served as a Company director since January 2008. He also serves as the Chair of the Audit Committee and as a member of the Succession Committee. As the Chair of the Audit Committee who signed the "Audit Committee Report" contained in each of the Proxy Statements, Defendant Pfenniger bears responsibility for the failure of the Company to maintain internal controls and for the repeated appointment of E&Y as independent auditor, when it was neither independent nor effective at ensuring the adequacy of the Company's internal controls. As a Company director, he conducted little, if any, oversight of the Discriminatory Misconduct (which Defendant Pfenniger engaged in and permitted despite being aware of it) or the Company's

60

engagement in the scheme to issue false and misleading statements, and consciously disregarded his duties to monitor internal controls over engagement in the scheme. He also solicited the Proxy Statements, which contained material misrepresentations and omissions, as alleged herein. Therefore, Defendant Pfenniger breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and demand upon him is futile and excused.

163.   Defendant Pfenniger also has an extensive business relationship with Defendant Frost dating back for approximately 30 years. Defendant Pfenniger joined IVAX in 1989, where Defendant Frost was Chairman and CEO and principal stockholder, as Senior Vice President-Legal Affairs and General Counsel. From May 1994 to March 1997, Defendant Pfenniger was Chief Operating Officer of IVAX under Defendant Frost. In 1992, Defendant Frost invested in Whitman and became its Chairman and principal stockholder, and Defendant Pfenniger, who was still an executive at IVAX, was appointed a director of Whitman. When IVAX was acquired by Teva, Defendant Pfenniger held 219,768 IVAX shares and 28,125 options of IVAX stock. In March 1997, Defendant Pfenniger left IVAX to join Whitman as Vice Chairman and CEO and served in that capacity until Whitman was acquired by Career Education Group in 2003. During his tenure at Whitman, Defendant Pfenniger acquired 613,049 shares and received over $1 million in cash compensation.

164.   In 2003, Defendant Pfenniger joined Continucare Corporation ("Continucare"), where Defendant Frost was the controlling stockholder and then-Vice Chairman. Defendant Pfenniger was CEO and Chairman of the board of Continucare from that time until Defendant Frost sold Continucare to Metropolitan Health Networks ("Metropolitan") in 2011. As of 2011, Defendant Pfenniger held 1,306,003 shares of Continucare, which were exchanged for $6.25 in cash and 0.0414 shares of Metropolitan stock on a per-share basis. He received approximately $5.1

million in cash for his cancelled Continucare options and received over $4.5 million in compensation from Continucare. Defendant Pfenniger also serves as a member of the board of directors of BioCardia, an entity in which Defendant Frost beneficially owned 10.7% of the equity as of October 31, 2020. As a director of BioCardia, Defendant Pfenniger holds 46,045 shares as of October 31, 2020 and has received roughly $46,250 in cash compensation for the fiscal year ended December 31, 2019.

165.    Defendant Pfenniger has a longstanding professional and personal relationship with Defendant Frost. Upon information and belief, since at least 2011 until the present, Defendant Pfenniger has served as a director of the 3-person board and the Secretary of Frost Administrative Services, Inc. Defendant Frost is one of the two remaining directors of Frost Administrative Services. Upon information and belief, since at least 2012 until the present, Defendant Pfenniger has been a director of the 3-person board of the Phillip and Patricia Frost Philanthropic Foundation, Inc., and Defendant Frost and his wife consist of the remaining two directors of the board and the only executives of the company.

166.    In February 2016, Defendant Pfenniger was appointed to the Board of Trustees of the Frost Science Museum. At that time, the Frost Science Museum dissolved its 40-member Board of Trustees and replaced its longtime co-chairs with a 4-person board, including Defendant Pfenniger and Defendant Frost's wife. Currently, Defendant Pfenniger is the Vice Chairman of the Board of Trustees and is a member of the Executive Committee. Upon information and belief, in February 2018, Defendant Pfenniger's son started as a business analyst at the Frost Science Museum. Defendant Pfenniger has been a director of BioCardia from 2016 to January 5, 2020. Defendant Pfenniger was paid $46,250 cash for the fiscal year ended December 31, 2019 for his board service at BioCardia. In 2013, Defendant Pfenniger invested alongside Defendant Frost in

Arno. Defendant Pfenniger also invested in RXi. Defendant Pfenniger currently serves as a director of Asensus, along with Defendant Hsiao, which has received considerable funding from Defendant Frost and OPKO.

167.    Additional reasons that demand on Defendant Yu is futile follow. Defendant Yu has served as a Company director since April 2009. As a Company director, she conducted little, if any, oversight of the Discriminatory Misconduct (which Defendant Yu engaged in and permitted despite being aware of it) or the Company's engagement in the scheme to issue false and misleading statements, and consciously disregarded her duties to monitor internal controls over engagement in the scheme. She also solicited the Proxy Statements, which contained material misrepresentations and omissions, as alleged herein. Therefore, Defendant Yu breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and demand upon her is futile and excused.

168.    Demand in this case is further excused because the Directors are beholden to and controlled by Defendant Frost, who controls OPKO by virtue of his share ownership, which provided him with approximately 33.86% of the total shareholder voting power as of April 27, 2020. These shareholdings provide Defendant Frost with significant control over the continued employment of the remaining Directors, especially Defendants Hsiao and Rubin, who are also executives of OPKO, and those Director-Defendants who have benefited from the related party transactions set forth above.

169.    Demand in this case is further excused because the Director-Defendants control OPKO and, as stated, are beholden to Defendant Frost. The Director-Defendants have longstanding business and personal relationships with Defendant Frost, who faces a substantial likelihood of liability, that preclude them from acting independently and in the best interests of

OPKO and the shareholders. These conflicts of interest precluded the Director-Defendants from adequately monitoring OPKO's internal controls and calling into question the Discriminatory Misconduct which is attributable to Defendant Frost and the other Individual Defendants.

170.    Defendants Hsiao and Rubin have the strongest connection to Defendant Frost, as they are each members of the Frost Group, the private equity firm specializing in PIPE investments founded in 2006. The Frost Group beneficially owned approximately 20,091,062 of OPKO's outstanding stock until March 10, 2020. Defendants Hsiao and Rubin are controlling members of the Frost Group and are so closely tied to that entity that they have had to disclaim ownership of OPKO shares held by the Frost Group in OPKO's annual proxy statements.

171.    Defendants Frost and Pfenniger serve together on the Board of Trustees of the Frost Science Museum, where Defendant Pfenniger is the Vice Chairman of the board.

172.    Also, many of the Individual Defendants, including, but not limited to, the following current Director-Defendants, have connections dating back decades through the IVAX. Defendant Frost founded IVAX and was its largest shareholder, with a 16.5% stock interest. The tenures of these Individual Defendants at IVAX overlap as follows:

i)      Defendant Frost was the CEO & Chairman from 1987 to 2006;

ii)     Defendant Hsiao was the Vice Chair – Technical Affairs from 1995 to 2006;

iii)    Defendant Rubin was the General Counsel and Secretary from 2001 to 2006; and

iv)     Defendant Pfenniger was the Chief Operating Officer from 1994 to 1997, and Senior Vice President of Legal Affairs and General Counsel from 1989-1994.

173.    The strong connections between Defendants Frost, Hsiao, and Rubin are further evidenced by their shared memberships on boards of various companies. Defendants Frost, Hsiao, and Rubin all served on the board of Cocrystal, where Defendants Frost and Rubin remain as

directors. Further, all three of them previously served on the Boards of several other companies, including Safestitch prior to its merger with TransEnterix (along with Defendant Pfenniger) and Prolor prior to its acquisition by OPKO in August 2013. Defendants Frost and Rubin also both previously served on the boards of Cogint and Sevion (prior to its merger with Eloxx). Defendants Frost, Rubin, and Krasno all serve together on the board of Castle Brands. Defendants Frost and Krasno serve on the board of Ladenburg Thalmann. Defendants Frost and Lerner both previously served on the board of Teva.

174.   Several of the Director-Defendants also serve together on boards for companies in which Defendant Frost and/or his entities invest or have an interest: (i) Defendant Hsiao is the board chair of NIMS where Defendant Rubin also serves as a Director; (ii) Defendants Hsiao and Pfenniger both serve on the board of TransEnterix; and (iii) Defendants Krasno and Pfenniger both serve on the board of BioCardia.

175.   Additional reasons that demand on the Board is futile follow.

176.   The false statements detailed herein in the Proxy Statements and, upon information and belief, the failure to establish term limits allowed for the Director-Defendants to entrench themselves on the Board and to continue to engage in the Discriminatory Misconduct, which resulted in not only a breach of the Director-Defendants' duties to the shareholders, but also resulted in lost profits for the Company. Therefore, demand is excused as to the Director-Defendants.

177.   Defendants Krasno, Paganelli, and Pfenniger, (the "Audit Committee Defendants") served as members of the Audit Committee during the Relevant Period. Pursuant to the Company's Audit Committee Charter, the Audit Committee Defendants are responsible for overseeing, among other things, OPKO's disclosure controls and procedures, system of internal controls, OPKO's

financial risk exposures, and OPKO's "compliance with legal and regulatory requirements." The Audit Committee Defendants were also responsible for, *inter alia*, overseeing the independent auditor's qualifications and independence and the performance of the Company's internal audit function and independent auditors. The Audit Committee Defendants utterly failed to monitor the state of the Company's compliance and the effectiveness of the Company's policies and compliance with the Code of Conduct as evinced by the long-standing Discriminatory Misconduct. They further failed to ensure the integrity of the Company's internal controls, as they are charged to do under the Audit Committee Charter, allowing the Company to engage in the Discriminatory Misconduct. Thus, the Audit Committee Defendants breached their fiduciary duties, are not disinterested, and demand is excused as to them. The Audit Committee Defendants failed in their oversight duties, reflecting clear deficiencies in the Company's ability to adequately implement or oversee its internal controls.

178.    Defendants Lerner and Paganelli (the "Corporate Governance and Nominating Committee Defendants") served as members of the Corporate Governance and Nominating Committee during the Relevant Period. Pursuant to the Company's Corporate Governance and Nominating Committee Charter, the Corporate Governance and Nominating Committee Defendants are responsible for, among other things, identifying individuals qualified to become members of the Board and selecting the director nominees. The Corporate Governance and Nominating Committee Defendants engaged or permitted the Company to engage in the Discriminatory Misconduct. Thus, the Corporate Governance and Nominating Committee Defendants breached their fiduciary duties, are not disinterested, and demand is excused as to them.

179.     Similarly, Defendants Fishel, Krasno, Lerner, and Pfenniger (the "Succession Committee Defendants") served as members of the Succession Planning Committee and were responsible for, *inter alia*, the philosophy of the Company's succession planning and plans for retaining and recommending members to the Company's senior management. They failed to adequately execute these responsibilities by taking no action to address or mitigate the Discriminatory Misconduct, beyond entrenching the Individual Defendants' leadership positions. Thus, the Succession Committee Defendants breached their fiduciary duties, are not disinterested, and demand is excused as to them.

180.     Demand in this case is excused because the Director-Defendants control the Company and are beholden to each other. As discussed above, the Director-Defendants have longstanding business and personal relationships with each other and the other Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders. In addition to the relationships detailed above, Defendant Logal currently serves as a director of Xenetic and Defendant Lerner co-invented the Xenetic's technology and had received 31,240 Xenetic shares. Additionally, non-party Medel served with Defendant Frost as a member of the Board of Trustees of the University of Miami from January 2004 to February 2012. Moreover, a majority of the Directors have been serving together on the Company's Board for more than a decade. These conflicts of interest precluded the Director-Defendants from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct. Thus, any demand on the Director-Defendants would be futile.

181.     In violation of the Company's Code of Conduct, the Director-Defendants conducted little, if any, oversight of the Discriminatory Misconduct (which the Director-Defendants engaged in and/or permitted despite being aware of it) or the Company's the scheme

to issue false and misleading statements concerning the Company's adherence to the Code of Conduct and OPKO's discrimination policy. In further violation of the Code of Conduct the Director-Defendants caused the Proxy Statements to not be accurate, complete, and honest. In addition, the Director-Defendants facilitated and disguised each other's violations of law including breaches of fiduciary duties and violations of the Exchange Act. Moreover, the Director-Defendants failed to report these violations, which failure is itself a further violation of the Code of Conduct. As a result, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

182.    OPKO has been, and will continue to be, exposed to significant losses and expenditures due to the wrongdoing of the Individual Defendants, including the Director-Defendants. To date, the Director-Defendants still have not filed any lawsuits against themselves or the others who were responsible for the scheme to issue materially false and misleading statements, the continued renomination of E&Y as independent auditor despite its lack of independence and effectiveness at ensuring the adequacy of the Company's internal controls, in an attempt to recover or mitigate any of the damages OPKO suffered and will continue to suffer as a result of such misconduct. Therefore, any demand upon the Director-Defendants would be futile.

183.    The Individual Defendants' conduct described herein could not have been the product of legitimate business judgment since it was the product of bad faith and intentional, reckless, or disloyal misconduct. As a result, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As all of the Director-Defendants face a substantial likelihood of liability, they have self-interest in the challenged transactions and are not able to exercise independent and

disinterested judgment about whether to pursue this action. Therefore, demand is futile and excused.

184.    The acts complained of herein constitute violations of fiduciary duties owed by OPKO's controlling shareholder, officers, and directors. Such acts are incapable of ratification.

185.    The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of OPKO. If there is a directors' and officers' liability insurance policy covering the Director-Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director-Defendants. Pursuant to such provisions, if the Director-Defendants were to sue themselves or certain of the officers of OPKO, they would enjoy no insurance protection. Accordingly, the Director-Defendants cannot be expected to sue themselves or the relevant officers of OPKO. However, if the suit is brought derivatively, as is this action, such insurance coverage, if it exists, will provide a basis for the Company to effectuate a recovery. Therefore, demand on the Director-Defendants is futile and excused.

186.    If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause OPKO to sue the Individual Defendants, since they would then face a large, uninsured individual liability. Demand is futile and excused in either event.

187.    In light of the above, all of the Director-Defendants, and, if not all of them, at least six of the Directors, cannot consider a demand with disinterestedness and independence. Therefore, demand on the Board is futile and excused.

## JURISDICTION AND VENUE

188.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiffs' claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1) and Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9.

189.    This Court has supplemental jurisdiction over Plaintiffs' state law claim pursuant to 28 U.S.C. § 1367(a).

190.    This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

191.    Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

192.    Venue is proper in this District because the Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## FIRST CLAIM

### Against Individual Defendants for Breach of Fiduciary Duties

193.    Plaintiffs incorporate by reference and re-allege allegations in paragraphs 1-120, 129-174, 176-181 herein, which paragraphs include, but are not limited to, allegations about false statements in Opko's annual proxy statements given that causing the issuance of false proxy statements comprises a breach of fiduciary duty.

194.    Each of the Individual Defendants owed to the Company the duty to exercise good faith, and loyalty in the management and administration of OPKO's business and affairs.

195. Each of the Individual Defendants violated and breached his or her fiduciary duties of good faith, loyalty, reasonable inquiry, oversight, and supervision.

196. The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of the Company.

197. In breach of their fiduciary duties, the Individual Defendants either engaged in or permitted and/or allowed the Company to engage in the Discriminatory Misconduct.

198. In further breach of their fiduciary duties owed to OPKO, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose, *inter alia*: (1) the Discriminatory Misconduct; (2) upon information and belief, the Company does not have term limits due to a desire to keep Black, Latinx, and other underrepresented individuals off of the Board; (3) the independent auditor the Company repeatedly reselected to evaluate its internal controls was neither independent nor effective at ensuring the adequacy of the Company's internal controls; and (4) the Company failed to maintain adequate internal controls.

199. The Individual Defendants also failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

200. In further breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

201.    The Individual Defendants also breached their fiduciary duties by continuing to select E&Y as their independent auditor when E&Y continually failed to properly audit and assess the Company's inadequate internal controls.

202.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the scheme to issue false and misleading Proxy Statements, and to reappoint E&Y as independent auditor when it was neither independent nor effective at ensuring the adequacy of internal controls. Such improper conduct was committed knowingly or recklessly. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme and to prevent such conduct from continuing to occur.

203.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's interests.

204.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary duties, OPKO has sustained, and continues to sustain, significant damages. As a result, the Individual Defendants are liable to the Company.

205.    Plaintiffs, on behalf of OPKO, have no adequate remedy at law.

## SECOND CLAIM

### Against Individual Defendants for Violations of
### Section 14(a) of the Exchange Act

206.    Plaintiffs incorporate by reference and re-allege allegations in paragraphs 1-120, 129-174, 176-181 herein, which paragraphs include, but are not limited to, allegations that the Individual Defendants breached their fiduciary duty by engaging in and causing Opko to engage in the Discriminatory Misconduct given that Plaintiffs' claims that the Individual Defendants violated Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1) are based on the failure of

Opko's proxy statements to disclose, *inter alia*, that the Individual Defendants breached their fiduciary duty by engaging in and causing Opko to engage in the Discriminatory Misconduct.

207.    The claims made pursuant to Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), that are alleged herein are based solely on negligence. They are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants. The Section 14(a) claims alleged herein do not allege and do not sound in fraud. Plaintiffs specifically disclaim any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these nonfraud claims. Plaintiffs otherwise incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

208.    Section 14(a) of the Exchange Act provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

209.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

210.    Under the direction and watch of the Directors, the Proxy Statements failed to disclose, *inter alia*: (1) the Discriminatory Misconduct; (2) upon information and belief, the

Company does not have term limits due to a desire to keep Black, Latinx, and other underrepresented individuals off of the Board; (3) the independent auditor the Company repeatedly reselected to evaluate its internal controls was neither independent nor effective at ensuring the adequacy of the Company's internal controls; and (4) the Company failed to maintain adequate internal controls.

211.    The Individual Defendants also caused the Proxy Statements to be false and misleading with regard to executive compensation in that they purported to employ "pay-for-performance" elements while failing to disclose the Discriminatory Misconduct.

212.    Moreover, the Proxy Statements were false and misleading when they discussed the Company's Code of Conduct, due to the Individual Defendants' failure to abide by the Code of Conduct, and their engagement in or the tolerance of the Discriminatory Misconduct and scheme to cause the Company to issue false and misleading statements and omissions of material fact relating to the Discriminatory Misconduct.

213.    In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the Proxy Statements were materially false and misleading. The misrepresentations and omissions were material to Plaintiffs in voting on the matters set forth for shareholder determination in the Proxy Statement, including, but not limited to, election of directors, appointment of E&Y as the Company's independent auditor, an advisory vote on executive compensation, and an approval of the Amendment Proposal.

214.    The false and misleading elements of the Proxy Statements led to the re-election of Defendants Frost, Hsiao, Rubin, Fishel, Krasno, Lerner, Paganelli, Pfenniger, and Yu which led to their entrenchment on the Board, allowed them to continue engaging in and/or permitting the

Discriminatory Misconduct and to continue breaching their fiduciary duties to OPKO, and the Company's loss of profits.

215.    The false and misleading elements of the Proxy Statements led to the continued shareholder approval of E&Y as the Company's independent auditor, when E&Y was neither independent nor effective in ensuring the adequacy of the Company's internal controls.

216.    The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the Proxy Statements.

**PRAYER FOR RELIEF**

217.    FOR THESE REASONS, Plaintiffs demand judgment in the Company's favor against all Individual Defendants as follows:

(a)     Declaring that Plaintiffs may maintain this action on behalf of OPKO, and that Plaintiffs are adequate representatives of the Company;

(b)     Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to OPKO;

(c)     Determining and awarding to OPKO the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)     Directing OPKO and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect OPKO and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1.  a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2.  a provision to permit the shareholders of OPKO to nominate at least six candidates for election to the Board, including three Black, Latinx, or otherwise racially or ethnically underrepresented individuals; and

3.  a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

4. a proposal to establish a fund to hire Black, Latinx, and individuals and other minorities, promote Black and Latinx individuals and other minorities to more management positions at the Company, establish and maintain a mentorship program at OPKO for Black and Latinx individuals and other underrepresented minorities that is committed to providing the skills and mentorship necessary to succeed at the Company;

5. a proposal to establish and require annual training of OPKO's entire Board and all executive officers, which training should focus at a minimum on diversity, antidiscrimination, and affirmative action, as well as other relevant topics; and

6. a proposal to adopt a revised executive compensation program that ties 30% of executives' compensation to the achievement of certain specified diversity goals.

7. a proposal to replace E&Y as the Company's independent auditor.

(e)      Awarding OPKO restitution from the Individual Defendants, and each of them;

(f)     Awarding Plaintiffs the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)     Granting such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Dated: April 19, 2021                              Respectfully submitted,

**THE LAW OFFICE OF JOSE D. SOSA, P.C.**

*/s/ Jose D. Sosa*
Jose D. Sosa
Fla. Bar No. 150878
1141 Via Jardin
Palm Beach Gardens, FL 33418
Telephone: (561) 670-8237
Email: pepe@pepesosalaw.com
sosalaw@yahoo.com

*Liaison Counsel for Plaintiffs*

**THE BROWN LAW FIRM, P.C.**
Timothy Brown (admitted *pro hac vice*)
240 Townsend Square
Oyster Bay, NY 11771
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net

**THE ROSEN LAW FIRM, P.A.**
Phillip Kim
275 Madison Avenue, 40th Floor
New York, NY 10016
Telephone: (212) 686-1060
Facsimile: (212) 202-3827
Email: pkim@rosenlegal.com

*Co-Lead Counsel for Plaintiffs*

DocuSign Envelope ID: 52D4482F-080B-4AC8-B683-1312BE9BB4C4

## **VERIFICATION**

I, Sammy Lee am a plaintiff the within action. I have reviewed the allegations made in this shareholder derivative complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. Executed this _th day of _____, 2020.

4/17/2021

Sammy Lee

Sammy Lee

DocuSign Envelope ID: C2A864E5-3E44-479D-92A3-747AA2409ED8

## VERIFICATION

I, Andy Yu am a plaintiff the within action. I have reviewed the allegations made in this shareholder derivative complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. Executed this _th day of _4/17/2021_, 2021.

_Andy Yu_
Andy Yu