UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 21-20885-CIV-ALTONAGA/Torres

SAMMY LEE, *et al.*,

     Plaintiffs,

v.

PHILLIP FROST, *et al.*,

     Defendants.

_____/

## ORDER

**THIS CAUSE** came before the Court on Defendants' Motion to Dismiss Plaintiffs' Verified Shareholder Derivative Consolidated Amended Complaint [ECF No. 62], filed on May 24, 2021.[1]  Plaintiffs, Sammy Lee and Andy Yu, filed a Response in Opposition [ECF No. 63] to the Motion; to which Defendants filed a Reply [ECF No. 68].  The Court has carefully considered the Consolidated Amended Complaint ("CAC") [ECF No. 61], the parties' written submissions, the record, and applicable law.  For the following reasons, the Motion is granted.

## I.     BACKGROUND

This shareholder derivative action arises from OPKO's alleged failure to diversify its Board of Directors and executive management team.  (*See generally* CAC).  Plaintiffs are shareholders of OPKO common stock.  (*See id.* ¶¶ 16–17).  OPKO is a Delaware corporation with its principal place of business in Miami, Florida and is publicly listed on the NASDAQ.  (*See id.*

---

[1] Defendants include Phillip Frost, Adam Logal, Jane H. Hsiao, Steven D. Rubin, Robert S. Fishel, Richard M. Krasno, Richard A. Lerner, John A. Paganelli, Richard C. Pfenniger, Jr., and Alice Lin-Tsing Yu, and Nominal Defendant OPKO Health, Inc. ("OPKO") (collectively, "Defendants" for purposes of this Order). (*See* Mot. 2).  The Court uses the pagination generated by the electronic CM/ECF database, which appears in the headers of all court filings.

¶ 18).   OPKO is a diversified healthcare company engaged in both the diagnostics and pharmaceuticals business.  (*See id.* ¶ 2).

Defendants, Phillip Frost, Adam Logal, Jane H. Hsiao, Steven D. Rubin, Robert S. Fishel, Richard M. Krasno, Richard A. Lerner, John A. Paganelli, Richard C. Pfenniger, Jr., and Alice Lin-Tsing Yu (the "Individual Defendants") are members of OPKO's Board.  (*See id.* ¶¶ 19–48). The Board "assumes accountability for confirming that OPKO follows federal and state laws that prohibit racial discrimination."  (*Id.* ¶ 87).  Frost is also OPKO's CEO and Chairman (*see id.* ¶ 19); and Logal serves as its Senior Vice President, CFO, Chief Accounting Officer, and Treasurer (*see id.* ¶ 22).  In addition, Hsiao is OPKO's Chief Technical Officer and Vice-Chairman (*see id.* ¶ 25), while Rubin is the Executive Vice President of Administration (*see id.* ¶ 28).

Krasno, Paganelli, and Pfenniger serve on the Board's Audit Committee.  (*See id.* ¶¶ 34, 40, 43).  The Audit Committee oversees the company's audits, reviews its internal controls, ensures "the integrity of [OPKO]'s financial statements[,]" and ensures "compliance with legal and regulatory requirements[.]"  (*Id.* ¶ 72 (alterations added)).  Fishel, Krasno, and Pfenniger serve on the Board's Succession Planning Committee, which recommends to the Board candidates for executive management positions.  (*See id.* ¶¶ 31, 34, 43, 70–71).  Lerner and Paganelli also serve on the Board's Corporate Governance and Nominating Committee (*see id.* ¶¶ 37, 40), which "identif[ies] individuals qualified to become Board of Directors members, consistent with criteria approved by the Board of Directors[;]" and has "sole responsibility" to formally recommend new Board candidates.  (*Id.* ¶ 69 (alterations added)).  Further, OPKO's Code of Conduct states "discrimination is not tolerated" and advises that employment decisions will not be based on factors such as "race" or "color[.]"  (*Id.* ¶ 64 (alteration added)).  The Code of Conduct applies to

all OPKO employees, including Board members and executive officers, and instructs employees to report suspected Code violations to their supervisors. (*See id.* ¶¶ 60–61, 63, 67).

Plaintiffs allege the Individual Defendants have "repeatedly refus[ed] to nominate, appoint, and/or hire Black or Latinx individuals or other underrepresented minorities to the Board or Black individuals to the executive management team[.]" (*Id.* ¶ 7 (alterations added)). Specifically, Plaintiffs allege that, despite OPKO's purported commitment to "a healthy work place[,]" "zero Black or Latinx individuals currently reside on [OPKO]'s Board and zero Black individuals work on [OPKO]'s executive management team." (*Id.* (alterations added; emphasis omitted; quotation marks omitted); *see also id.* ¶ 86). "Instead, the overwhelming majority are . . . White men." (*Id.* ¶ 87 (alteration added)). This lack of diversity is particularly significant given other companies' recent social justice initiatives. (*See id.* ¶¶ 79–85).

In order to maintain the Individual Defendants' control of OPKO and to "keep Black, Latinx, and other underrepresented individuals off of the Board[,]" OPKO does not limit the number of terms a Board member can serve. (*Id.* ¶ 13 (alteration added); *see also id.* ¶ 91). For example, at least half of the current Board members have been serving for over 13 years. (*See id.* ¶ 91). These policies are not in OPKO's best interests, as studies show investors view long-tenured directors as cause for concern and companies with diverse boards are more likely to experience higher profits. (*See id.* ¶¶ 11, 90).

As further proof that the Individual Defendants have perpetuated a non-diverse and non-inclusive corporate culture, Plaintiffs cite "numerous complaints regarding the lack of room for growth based on merit via reviews left by former and current employees of OPKO on websites such as Niche, Glassdoor, and Indeed." (*Id.* ¶ 88). The cited reviews state "many positions are filled based on who you know" or who is "liked by Management[,]" and the company's leadership

3

"is not focused on the welfare of [the] employees." (*Id.* (alterations adopted; other alteration added; quotation marks omitted)).  Further, on July 16, 2019, BioReference Laboratories, Inc., a wholly owned subsidiary of OPKO, was sued for alleged discrimination and harassment based on race.  (*See id.* ¶¶ 75, 78).  BioReference settled the lawsuit in November 2020.  (*See id.* ¶ 78).

In addition to failing to diversify the Board or ensure compliance with state and federal antidiscrimination laws (*see id.* ¶¶ 7, 74, 86–87, 89), the Individual Defendants have failed to maintain adequate internal controls and continue appointing an ineffective independent auditor to assess OPKO's internal controls regarding diversity and antidiscrimination (*see id.* ¶¶ 12–13, 92).

Despite their knowledge of the alleged discriminatory misconduct — by virtue of their participation in and failure to rectify or monitor it — the Individual Defendants caused OPKO to make misleading statements in three of its annual Proxy Statements regarding the company's commitment to diversity and compliance with its Code of Conduct.  (*See id.* ¶¶ 4, 8, 13).  OPKO's 2018, 2019, and 2020 Proxy Statements assured investors the Code of Conduct "applies to all employees, officers, and directors of the [c]ompany[;]" but failed to disclose the Code of Conduct was not followed due to the Individual Defendants' discrimination in filling Board positions and their failure to report such Code violations.  (*Id.* ¶¶ 95, 103, 111 (alterations added; quotation marks omitted)).

The Proxy Statements also represented that the Board values "diversity of knowledge base, professional experience[,] and skills[;] and the Corporate Governance and Nominating Committee takes these qualities into account when considering director nominees for recommendation to the Board."  (*Id.* ¶¶ 96, 104, 112 (alterations added; quotation marks omitted)).  Yet, the Proxy Statements (1) failed to disclose that the Individual Defendants were repeatedly refusing to hire or nominate Black, Latinx, or other underrepresented minorities to the Board or executive

management team (*see id.* ¶¶ 97, 100, 105, 108, 113, 116); (2) failed to disclose the lack of director term limits due to a racist desire to keep Black, Latinx, and other underrepresented individuals off the Board (*see id.* ¶¶ 98, 100, 106, 108, 114, 116); (3) failed to disclose that the company's internal controls were inadequate to ensure compliance with the Code of Conduct and protect underrepresented individuals from discrimination in the Board and executive team selection processes (*see id.* ¶¶ 99–100, 107–08, 115–16); and (4) failed to disclose that the company's long-time independent auditor was neither independent nor effective at ensuring the adequacy of the company's internal controls (*see id.* ¶¶ 100, 108, 116).

In sum, Plaintiffs allege the 2018, 2019, and 2020 Proxy Statements were materially misleading because OPKO had no interest in addressing the alleged lack of racial diversity and discriminatory practices regarding the nomination and appointment of minority Board and executive team candidates. (*See id.* ¶¶ 4, 8, 13, 97, 105, 113, 210, 212). The Individual Defendants "deceived the public by claiming to abide by certain antidiscrimination policies" (*id.* ¶ 10), while "doing very little to curb discrimination occurring at the [c]ompany or its subsidiaries" (*id.* ¶ 4 (alteration added)). In doing so, "the Individual Defendants have breached their duty of candor and have also violated the federal securities laws." (*Id.* ¶ 10). As a result of the material misstatements contained in the 2018, 2019, and 2020 Proxy Statements, shareholders elected or re-elected the Individual Defendants to the Board, which allowed the discriminatory practices to continue, and ratified the repeated appointment of the company's ineffective independent auditor. (*See id.* ¶¶ 100, 108, 116).

Plaintiffs did not make a demand on the Board to institute this action under Federal Rule of Civil Procedure 23.1. Instead, they allege such a demand would have been futile and is therefore excused. (*See id.* ¶¶ 124–87). Plaintiffs bring claims for breach of fiduciary duty and violations

of Section 14(a) of the Securities Exchange Act.  (*See id.* ¶¶ 193–216).[2]  Defendants now move to

dismiss the CAC, arguing: (1) Plaintiffs failed to make a pre-suit demand and have not pleaded

with sufficient particularity why such a demand would have been futile; (2) Plaintiffs fail to state

a claim for breach of fiduciary duty or violation of Section 14(a); and (3) the CAC is a deficient

shotgun pleading.  (*See generally* Mot.; Reply).

## II.     LEGAL STANDARDS

***Rule 12(b)(6).***  "To survive a motion to dismiss [under Federal Rule of Civil Procedure

12(b)(6)], a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to

relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (alteration added;

quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  Although this pleading standard

"does not require 'detailed factual allegations,' . . . it demands more than an unadorned, the-

defendant-unlawfully-harmed-me accusation."  *Id.* (alteration added; quoting *Twombly*, 550 U.S.

at 555).  Pleadings must contain "more than labels and conclusions, and a formulaic recitation of

the elements of a cause of action will not do."  *Twombly*, 550 U.S. at 555 (citation omitted).

"[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss."  *Iqbal*,

556 U.S. at 679 (alteration added; citing *Twombly*, 550 U.S. at 556).

To meet this "plausibility standard," a plaintiff must "plead[] factual content that allows

the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."

*Id.* at 678 (alteration added; citing *Twombly*, 550 U.S. at 556).  "The mere possibility the defendant

acted unlawfully is insufficient to survive a motion to dismiss."  *Sinaltrainal v. Coca-Cola Co.*,

578 F.3d 1252, 1261 (11th Cir. 2009) (citation omitted), abrogated on other grounds by *Mohamad*

---

[2] Plaintiff, Sammy Lee, filed this derivative action against Defendants on March 5, 2021.  (*See generally* Compl. [ECF No. 1]).  Plaintiff, Andy Yu, filed a substantially similar derivative action in this District on March 11, 2021; and the Court consolidated the actions on March 19, 2021.  (*See* Order Consolidating Cases [ECF No. 16]).  Plaintiffs filed their CAC on April 19, 2021.  (*See generally* CAC).

*v. Palestinian Auth.*, 566 U.S. 449 (2012).  When considering a motion to dismiss, a court must construe the complaint in the light most favorable to the plaintiff and take the factual allegations as true.  *See Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1369 (11th Cir. 1997) (citing *SEC v. ESM Grp., Inc.*, 835 F.2d 270, 272 (11th Cir. 1988)).

**Section 14(a) of the Securities Exchange Act and Rule 9(b).**  For Section 14(a) claims alleging that a defendant made an untrue statement of material fact (or omitted a material fact), the complaint must specify each statement alleged to be misleading; the reason or reasons why the statement is misleading; and, if an allegation regarding the statement or omission is made on information and belief, the complaint must "state with particularity all facts on which that belief is formed."   15 U.S.C. § 78u-4(b)(1).  In any case where plaintiffs may recover damages only on proof that a defendant acted with a particular state of mind, the complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  *Id.* § 78u-4(b)(2)(A).

"If a plaintiff's federal securities claim sounds in fraud, then the heightened pleading standards of Rule 9(b) apply."  *Ocegueda ex rel. Facebook v. Zuckerberg*, No. 20-cv-04444, 2021 WL 1056611, at *5 (N.D. Cal. Mar. 19, 2021) (citation omitted).[3]  Rule 9(b) requires plaintiffs

---

[3] Plaintiffs argue the requirements of 15 U.S.C. section 78u-4(b)(2) and Rule 9(b) do not apply because the CAC expressly states the Section 14(a) claims are "based solely on negligence."  (CAC ¶ 207; *see id.* 34 n.7, 36 n.8, 39 n.9; *see* Resp. 7–8).  While Plaintiffs are correct that Section 14(a) claims may be based solely on negligence, their claim plainly is not.  Plaintiffs' Section 14(a) claim is grounded in the same conduct that forms the basis of their breach-of-fiduciary-duty claim — allegations that Defendants engaged in discrimination, knowingly failed to disclose their discriminatory conduct, knew the Proxy Statements were false and misleading, and consciously disregarded their duty to monitor the company's internal controls.  (*See, e.g.*, CAC ¶¶ 9, 54, 74, 125, 127, 129, 137, 143, 149–50, 154, 160, 162, 167; *see also id.* ¶¶ 89, 128 (alleging Defendants were "aware" of their allegedly illegal misconduct); *see also id.* ¶ 181 (referring to Defendants' "scheme to issue false and misleading statements")).  Throughout the CAC, Plaintiffs allege Defendants took or failed to take these actions "knowing[ly]" (*id.* ¶ 54 (alteration added); *id.* ¶¶ 125, 127–28, 202); "culpabl[y] (*id.* ¶ 54 (alteration added)); "intentional[ly]" (*id.* ¶¶ 183, 196 (alteration added)); "willfully" (*id.* ¶ 198); and "reckless[ly]" (*id.* ¶ 54 (alteration added); *id.* ¶¶ 125, 127, 183, 196, 198, 202).

alleging fraud to "state with particularity the circumstances constituting fraud or mistake." Fed.

R. Civ. P. 9(b). A party asserting a fraud-based claim must therefore allege:

> (1) precisely what statements were made in what documents or oral representations or what omissions were made, and (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) same, and (3) the content of such statements and the manner in which they misled the plaintiff, and (4) what the defendants obtained as a consequence of the fraud.

*Giuliani v. NCL (Bahamas) Ltd.*, No. 1:20-cv-22006, 2021 WL 2573133, at *3 (S.D. Fla. June 23,

2021) (citations omitted); *see also Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1291 (11th

Cir. 2010). In other words, "the Complaint must set forth particular allegations about the 'who,

what, when, where, and how' of the fraud." *Ceithaml v. Celebrity Cruises, Inc.*, 207 F. Supp. 3d

1345, 1353 (S.D. Fla. 2016) (citation omitted).

    ***Pre-Suit Demand and Rule 23.1.*** The parties agree Delaware substantive law governs

this action. (*See* Mot. 8; Resp. 11–12). Under Delaware law, "an aggrieved shareholder must

demand that the board take the desired action prior to bringing [a derivative] suit." *Staehr v. Alm*,

269 F. App'x 888, 891 (11th Cir. 2008) (alteration added; citation omitted). Federal Rule of Civil

Procedure 23.1, in turn, applies a heightened pleading standard for derivative actions, requiring

the plaintiff to "state with particularity: (A) any effort by the plaintiff to obtain the desired action

---

    Despite Plaintiffs' insistence to the contrary, such claims sound in fraud. Plaintiffs' Section 14(a) claim is therefore subject to the requirements of section 78u-4(b)(2) and Rule 9(b). *See Ocegueda*, 2021 WL 1056611, at *9 (concluding heightened pleading standards applied to similar allegations sounding in fraud, despite plaintiff "limit[ing] her claim to negligence in her opposition" (alteration added)); *In re Columbia Pipeline, Inc.*, 405 F. Supp. 3d 494, 506 (S.D.N.Y. 2019) ("[W]hen plaintiffs assert Section 14(a) claims grounded in alleged fraudulent conduct, they are subject to heightened pleading requirements, even if they disclaim reliance on a fraud theory." (alteration added; other alteration adopted; citations and quotation marks omitted)); *Little Gem Life Scis., LLC v. Orphan Med., Inc.*, 537 F.3d 913, 917 (8th Cir. 2008) (holding the PSLRA's pleading requirements, including section 78u-4(b)(2), apply to Section 14(a) claims); *Knollenberg v. Harmonic, Inc.*, 152 F. App'x 674, 682–83 (9th Cir. 2005) (same); *Cal. Pub. Emps.' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 144–45 (3d Cir. 2004) (holding Rule 9(b) and the PSLRA's heightened pleading requirements apply to Section 14(a) claims, at least where such claims are based on allegations of fraud); *but see In re Heckmann Corp. Secs. Litig.*, 869 F. Supp. 2d 519, 538 (D. Del. 2012) ("This court has declined to apply the PSLRA's heightened pleading requirements [under section 78u-4(b)(2)] to claims brought under [Section] 14(a)." (alterations added; footnote call number omitted)).

from the directors or comparable authority and, if necessary, from the shareholders or members; and (B) the reasons for not obtaining the action or not making the effort." Fed. R. Civ. P. 23.1(b)(3). "Failure to make a demand or to show why a demand would be futile means dismissal." *McDowell v. Bracken*, 794 F. App'x 910, 913 (11th Cir. 2019) (citations omitted).

## III.   DISCUSSION

Defendants contend the Court must dismiss Plaintiffs' action for failure to adequately plead demand futility. (*See* Mot. 8–14; Reply 4–8). The Court agrees.

## A.   Delaware Law Regarding Demand Futility

Under Delaware law, a pre-suit demand is excused as futile if the plaintiff alleges "particularized facts creating a reasonable doubt that a majority of the Board would be disinterested or independent in making a decision on a demand." *Rales v. Blasband*, 634 A.2d 927, 930 (Del. 1993); *see also Aronson v. Lewis*, 473 A.2d 805, 814–15 (Del. 1984).[4] In other words, the plaintiff

---

[4] *Aronson* and *Rales* provide two similar, but not identical, tests for determining whether the allegations of a complaint sufficiently plead demand futility. *See Wood v. Baum*, 953 A.2d 136, 140 (Del. 2008). The *Aronson* test applies where a plaintiff challenges a Board decision, alleging "the directors made a conscious business decision in breach of their fiduciary duties." *Id.* That test requires that the plaintiff allege particularized facts creating a reason to doubt that "(1) the directors are disinterested and independent[,] or that (2) the challenged transaction was otherwise the product of a valid exercise of business judgment." *Id.* (first alteration added; other alteration adopted; quotation marks and footnote call number omitted; citing *Aronson*, 473 A.2d at 814).

The *Rales* test applies where the derivative suit is based on "a violation of the Board's oversight duties." *Id.* The *Rales* test requires the plaintiff to allege particularized facts creating a reason to doubt that "the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand." *Id.* (quotation marks and footnote call number omitted; citing *Rales*, 634 A.2d at 934). Complaints alleging board inaction or violation of the board's oversight duties are commonly referred to as *Caremark* claims. *See In re Caremark Int'l Inc. Derivative Litig.*, 698 A.2d 959 (Del. Ch. 1996); *In re Goldman Sachs Grp., Inc. Shareholder Litig.*, Civ. Act. No. 2515, 2011 WL 4826104, at *18 (Del. Ch. Oct. 12, 2011) (applying *Rales* test to *Caremark* claim).

Plaintiffs insist they do not allege a *Caremark* claim. (*See* Resp. 11 n.4). Yet, the CAC contains several allegations based on a lack of oversight. (*See* CAC ¶¶ 9, 12, 92, 129, 137, 143, 149–50, 154, 160, 162, 167, 177, 181, 195, 200; *see also* Resp. 13). Plaintiffs' allegations plainly do not attack a specific business judgment or action of the Board. Plaintiffs also rely on the *Rales* test in their Response and do not invoke *Aronson*'s second prong. (*See* Resp. 11, 13).

must show the directors are "incapable of making an impartial decision regarding the pursuit of the litigation." *Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart*, 845 A.2d 1040, 1048 (Del. 2004) (footnote call number omitted). The "directors are entitled to a *presumption* that they were faithful to their fiduciary duties[,]" and "the burden is upon the plaintiff in a derivative action to overcome that presumption." *Id.* at 1048–49 (alteration added; emphasis in original; footnote call numbers omitted). "Mere notice pleading is insufficient to meet the plaintiffs' burden to show demand excusal in a derivative case." *Guttman*, 823 A.2d at 499 (footnote call number omitted).

To show that a director is "interested," the plaintiff must plead particularized facts showing either (1) that the director faces a substantial likelihood of liability on any of the claims that are the subject of the litigation, or (2) that the director received a personal benefit from the alleged wrongdoing or would otherwise be materially affected in a manner not equally shared with the stockholders. *See United Food & Com. Workers Union v. Zuckerberg*, 250 A.3d 862, 890 (Del. Ch. 2020); *In re Mako Surgical Corp. Derivative Litig.*, No. 12-61238, 2013 WL 12131315, at *2 (S.D. Fla. June 6, 2013). The "mere threat" of potential liability is insufficient; a director is deemed "interested" only if the potential for liability rises to a "substantial likelihood." *Ryan v. Gifford*, 918 A.2d 341, 355 (Del. Ch. 2007) (citation, quotation marks, and footnote call number omitted).

"Where directors are contractually or otherwise exculpated from liability for certain conduct, then a serious threat of liability may only be found to exist if the plaintiff pleads a *non-*

---

In any event, it is unnecessary to determine which particular test applies in this case. Plaintiffs' allegations and arguments for demand futility implicate both the *Rales* test and the first prong of the *Aronson* test, which Delaware courts have recognized involve the same core inquiry. *See, e.g.*, *Guttman v. Huang*, 823 A.2d 492, 500 (Del. Ch. 2003) ("[T]he differences between the *Rales* and the *Aronson* tests in the circumstances of this case are only subtly different, because the policy justification for each test points the court toward a similar analysis." (alteration added)).

*exculpated* claim against the directors based on particularized facts." *Wood*, 953 A.2d at 141 (emphasis in original; citation, quotation marks, and footnote call number omitted). Section 9.1 of OPKO's Amended and Restated Certificate of Incorporation exculpates its directors "[t]o the fullest extent permitted by [Delaware law]" for breaches of fiduciary duty, except for liability for breach of the duty of loyalty, acts not taken in good faith, intentional misconduct, or knowing violations of law. (OPKO Health, Inc., Form for Registration of Certain Classes of Securities (Form 8-A) 28 (June 8, 2007) ("OPKO Registration Form") (alterations added); *see also* Mot. 10).[5] "Where, as here, directors are exculpated from liability except for claims based on fraudulent, illegal[,] or bad faith conduct, a plaintiff must also plead particularized facts that demonstrate that the directors acted with scienter, *i.e.,* that they had actual or constructive knowledge that their conduct was legally improper." *Wood*, 953 A.2d at 141 (alteration added; citation, quotation marks, and footnote call number omitted).

To show a director lacks independence, the plaintiff "must create a reasonable doubt that a director is not so beholden to an interested director . . . that his or her discretion would be sterilized." *Beam*, 845 A.2d at 1050 (alteration added; citation, quotation marks, and footnote call number omitted); *see also McElrath v. Kalanick*, 224 A.3d 982, 991 (Del. 2020) ("Independence turns on whether [a director is] either subject to the interested party's dominion or beholden to that interested party." (alteration added; citation, quotation marks, and footnote call number omitted)). A plaintiff bringing a derivative action "must plead facts specific to each director, demonstrating that at least half of them" are either interested or not independent. *Desimone v. Barrows*, 924 A.2d

---

[5] The Court takes judicial notice of the exculpatory provision in OPKO's Certificate of Incorporation. (*See* CAC ¶ 183; OPKO Registration Form 28); *Druskin v. Answerthink, Inc.*, 299 F. Supp. 2d 1307, 1320 (S.D. Fla. 2004) (explaining that under *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271 (11th Cir. 1999), district courts may take judicial notice of SEC filings and documents incorporated into the complaint in securities fraud cases at the motion-to-dismiss stage); *BCJJ, LLC v. LeFevre*, 8:09-cv-551, 2012 WL 12910610, at *7 (M.D. Fla. Aug. 3, 2012) (taking judicial notice of company's articles of incorporation).

908, 943 (Del. Ch. 2007) (emphasis omitted; citation and footnote call number omitted).  Where

the plaintiff has not met his burden to demonstrate at least one director is interested, however, there

is no need to consider the independence of the remaining directors.  *See Klein v. Ellison*, No. 20-

cv-04439, 2021 WL 2075591, at *3 (N.D. Cal. May 24, 2021) (explaining demand futility under

Delaware law is a two-step inquiry and the court need not evaluate independence if the plaintiff

has not shown any director is interested).

## B.    Application to Plaintiffs' Allegations

Plaintiffs allege each Individual Defendant faces a substantial likelihood of liability for

violating both his or her fiduciary duties and Section 14(a), and they cite several other general

reasons Defendants are interested.  Plaintiffs further allege that, as the controlling shareholder,

Frost is inherently interested.  Any remaining Defendants, Plaintiffs state, are beholden to Frost

because they earn substantial compensation as directors and own stock in the company, several

hold executive positions at OPKO as well, and many have other business and personal

relationships with Frost.  (*See* CAC ¶¶ 124–87; Resp. 11–21).  The Court addresses each argument

in turn.[6]

### 1.    Substantial Likelihood of Liability

#### i.    *Breach of Fiduciary Duty*

As noted, OPKO's charter exculpates the Individual Defendants from liability except for

claims based on the breach of the duty of loyalty or other acts taken in bad faith.  Thus, to the

extent Plaintiffs allege Defendants breached any other fiduciary duties, such as a duty to exercise

---

[6] As an initial matter, the Court observes Plaintiffs rely almost entirely on group pleading, which is insufficient under Delaware law to excuse demand.  *See In re Citigroup Inc. S'holder Derivative Litig.*, 964 A.2d 106, 121 n.36 (Del. Ch. 2009) (rejecting plaintiffs' "'group' accusation mode of pleading demand futility" instead of providing "individual allegations as to each of the director defendants"); *Desimone*, 924 A.2d at 943 ("[A] derivative complaint must plead facts *specific to each director*[.]" (alterations added; emphasis in original)).

due care, Defendants do not face a substantial likelihood of liability for such claims because they are clearly precluded by the exculpatory clause.

Recognizing this limitation, Plaintiffs instead premise their breach-of-fiduciary-duty claim on alleged breaches of Defendants' duties of "good faith, loyalty, reasonable inquiry, oversight, and supervision." (CAC ¶ 195). "The duty of loyalty requires directors to put the best interests of the corporation ahead of any other interest held by the directors and not shared by the stockholders." *In re Oracle Corp. Derivative Litig.*, Civ. Act. No. 2017-0337, 2018 WL 1381331, at *11 (Del. Ch. Mar. 19, 2018) (citation and footnote call number omitted). The duty to act in good faith is a subset of the duty of loyalty. *See id.* (citation and footnote call number omitted).

In order to show bad-faith conduct sufficient to excuse a pre-suit demand, a plaintiff must plead particularized facts demonstrating the directors acted with scienter; in other words, that they acted with bad intent, were intentionally derelict in their duties, or consciously disregarded their responsibilities. *See In re Goldman Sachs Grp., Inc. Shareholder Litig.*, 2011 WL 4826104, at *12 (citation omitted). This is a high burden, requiring an "extreme set of facts[.]" *Lyondell Chem. Co. v. Ryan*, 970 A.2d 235, 243 (Del. 2009) (alteration added; citation, quotation marks, and footnote call number omitted). This is so because "there is a vast difference between an inadequate or flawed effort to carry out fiduciary duties and a conscious disregard for those duties." *Id.* Classic examples of bad-faith conduct include (1) "intentionally act[ing] with a purpose other than that of advancing the best interests of the corporation"; (2) acting with an intent to break the law; or (3) "intentionally fail[ing] to act in the face of a known duty to act[.]" *In re Walt Disney Co. Derivative Litig.*, 906 A.2d 27, 67 (Del. 2006) (alterations added; citation and footnote call number omitted).

Plaintiffs contend the Individual Defendants face a substantial likelihood of liability for breaching their duties of loyalty in three ways: (1) engaging in the alleged discriminatory conduct (*see* CAC ¶ 197); (2) causing the company to issue false and misleading Proxy Statements (*see id.* ¶ 198); and (3) failing to maintain adequate oversight over the company's internal controls (*see id.* ¶¶ 200–01). (*See also* Resp. 12–13). Quite simply, Plaintiffs have not sufficiently alleged Defendants face a substantial likelihood of liability on these claims because, despite their assertion to the contrary, Plaintiffs have not pleaded "particularized facts concerning how the actions of each Defendant amounted to a breach of loyalty[.]" (*Id.* 14 (alteration added)).

The CAC is replete with conclusory allegations. Although Plaintiffs allege Defendants violated unspecified anti-discrimination laws and OPKO's Code of Conduct by refusing to nominate Black, Latinx, or other underrepresented individuals to the Board or executive management team (*see* CAC ¶¶ 7, 9, 74, 77, 89, 197); Plaintiffs offer no particularized facts to animate these accusations. Instead, Plaintiffs point to a settled lawsuit against one of OPKO's subsidiaries as well as other companies' recent social justice initiatives. (*See id.* ¶¶ 78–86). These allegations have no bearing on whether *OPKO*'s directors discriminated against underrepresented minorities when nominating individuals to serve on *OPKO*'s Board or executive team.

Plaintiffs further argue "a lack of diversity [on OPKO's Board] is a compelling signal that the [c]ompany does, in fact, discriminate" (*id.* ¶ 87 (alterations added)), and they allege Defendants "fail[ed] to implement term limits in an effort to maintain control of the [c]ompany by avoiding the addition of diverse candidates to the Board" (*id.* ¶ 91 (alterations added)). These are mere conclusions unsupported by particularized facts. Indeed, none of these statements contains *particularized facts* supporting an inference that the Individual Defendants acted in bad faith,

*intentionally* acted against the company's interest, or *consciously* disregarded their duties of loyalty. At most, these circumstantial statements evince an exculpated lack of due care.

Plaintiffs also allege the Individual Defendants face substantial liability for "causing the [c]ompany" to make false and misleading statements and omissions in the 2018, 2019, and 2020 Proxy Statements; but Plaintiffs fail to plead particularized facts showing the Proxy Statements were actually false and misleading. (*Id.* ¶ 74 (alteration added); *see also id.* ¶ 198). Plaintiffs simply allege the Proxy Statements were false and misleading because they failed to disclose the following facts: (1) Defendants refused to nominate Black, Latinx, or other underrepresented minorities to the Board or executive team; (2) OPKO did not have term limits due to a desire to keep Black, Latinx, and other underrepresented minorities off the Board; (3) the company failed to maintain adequate internal controls; and (4) the company repeatedly selected an ineffective independent auditor to evaluate its internal controls. (*See id.* ¶¶ 74, 97–100, 105–108, 113–116, 198).[7] Once again, these are not facts, let alone particularized facts; they are conclusions. *See Pfeffer v. Redstone*, 965 A.2d 676, 687 (Del. 2009) ("[W]hen alleging duty of disclosure violations, it is inherent . . . that the misstated or omitted facts be identified and that the pleading not be merely conclusory." (alterations added; quotation marks, citation, and footnote call number omitted)). In essence, Plaintiffs ask the Court, for purposes of their Proxy Statement breach-of-loyalty claim, to

---

[7] Plaintiffs contend these omissions rendered false and misleading two statements contained in the Proxy Statements: (1) that the company's Code of Conduct "applie[d] to all employees, officers, and directors"; and (2) that the Board valued "diversity of knowledge base, professional experience[,] and skills[.]" (CAC ¶¶ 95–96, 103–04, 111–12 (alterations added)). Plaintiffs argue these statements were false because Defendants refused to hire or nominate Black, Latinx, or other underrepresented minorities to the Board, thereby discriminating in violation of the Code of Conduct and demonstrating a lack of commitment to diversity. But Plaintiffs' failure to plead particularized facts supporting an inference that Defendants intentionally engaged in such discriminatory misconduct is equally fatal to their claim that the Proxy Statements were false and misleading for failing to disclose the same.

accept as particularized facts their general and conclusory allegations that Defendants are liable for the other misconduct of which Plaintiffs accuse them.  This, the Court will not do.

Even assuming Plaintiffs pleaded particularized facts indicating the Proxy Statements were in fact false or misleading, they fail to plead specific facts suggesting Defendants were involved in preparing the Proxy Statements or that Defendants "had knowledge that any disclosures or omissions were false or misleading or that [they] acted in bad faith in not adequately informing themselves."  *In re Citigroup*, 964 A.2d at 134 (alteration added; citation and footnote call number omitted).  Plaintiffs allege the Individual Defendants "signed[,]" "solicited[,]" and "caused" the company to issue, and were "ultimately responsible for the statements contained in the Proxy Statements.  (CAC ¶¶ 4, 93, 101, 109, 129, 137, 143, 149–50, 154, 160, 162, 167, 181, 198; Resp. 5, 13 (alterations added)).  Yet, these allegations are "not sufficient[ly] particularized . . . to excuse demand under Rule 23.1."  *In re Citigroup*, 964 A.2d at 133 n.88 (alterations added; holding allegations that the defendants "caused or allowed" the company to issue certain statements were insufficient).  Indeed, "Delaware courts have consistently required plaintiffs to allege directors' involvement in the preparation and approval of disclosures before inferring directors' knowledge that the disclosures were false or misleading."  *In re Beazer Homes USA, Inc. Derivative Litig.*, No. 1:19-cv-03377, 2021 WL 1696385, at *5 (N.D. Ga. Mar. 30, 2021) (quotation marks and citation omitted; collecting cases; concluding allegations that defendants "signed" and "consent[ed] to the[] dissemination" of SEC filings were insufficient to infer knowledge (alterations added)).  Plaintiffs make no such allegations.

Plaintiffs further suggest certain Defendants' memberships on the Audit Committee, which was responsible for "the integrity of the [c]ompany's financial statements[,]" are a sufficient basis to infer the requisite scienter.  (CAC ¶ 72 (alterations added)).  "That assertion is contrary to well-

settled Delaware law." *Wood*, 953 A.2d at 142; *see also South v. Baker*, 62 A.3d 1, 17 (Del. Ch. 2012) ("As numerous Delaware decisions make clear, an allegation that the underlying cause of a corporate trauma falls within the delegated authority of a board committee does not support an inference that the directors on that committee knew of [or] consciously disregarded [a] problem[.]" (alterations added; footnote call number omitted; collecting cases)).   Aside from a few conclusory allegations (*see, e.g.*, CAC ¶ 202; Resp. 11 n.4), Plaintiffs do not offer any other particularized facts indicating Defendants actually or constructively knew the Proxy Statements contained material falsehoods or omissions.[8]   *See In re Mako Surgical Corp.*, 2013 WL 12131315, at *3–4 ("The mere fact that [some defendants] served on [the company]'s Audit Committee does not establish the futility of demand as to these defendants where [p]laintiff has failed to establish that these defendants had knowledge that the [public statement] was false and misleading." (alterations added)).

Finally, Plaintiffs allege the Individual Defendants face a substantial likelihood of liability for breaching their duty of loyalty by failing to maintain an adequate system of oversight and internal controls and by continually re-appointing an ineffective independent auditor.  (*See* CAC ¶¶ 127, 129, 137, 143, 149–50, 154, 160, 162, 167, 177, 181, 200–01; Resp. 11, 13).   Despite Plaintiffs' insistence otherwise (*see* Resp. 11 n.4), such claims are inescapably *Caremark* claims.

---

[8] To the contrary, Plaintiffs explicitly disclaim any allegation that the Individual Defendants recklessly or knowingly made misleading statements in the Proxy Statements.  (*See* CAC 34 n.7, 36 n.8, 39 n.9). Plaintiffs apparently do so in an attempt to avoid application of the PSLRA's heightened pleading requirements to their Section 14(a) claim.  (*See* Resp. 7).  But Plaintiffs cannot have their cake and eat it too.  As the Court has already explained, Plaintiffs' claims plainly sound in fraud and, notwithstanding their disclaimer, Plaintiffs intimate elsewhere in the CAC and Response — albeit in conclusory fashion — that Defendants knew the Proxy Statements were false and misleading.  In any event, Plaintiffs' failure to plead particularized facts "showing individualized awareness of fraud" precludes a finding of demand futility.  *In re Beazer Homes USA*, 2021 WL 1696385, at *6 (quotation marks and citation omitted).

*See McDowell v. Bracken*, 317 F. Supp. 3d 1162, 1175 (S.D. Fla. 2018), *aff'd*, 794 F. App'x 910

(classifying oversight liability and inadequate controls claims as *Caremark* claims).

> To prove director oversight liability, a plaintiff must demonstrate:
>
> (a) the directors utterly failed to implement any reporting or information system or controls; *or* (b) having implemented such a system or controls, consciously failed to monitor or oversee its operations thus disabling themselves from being informed of risks or problems requiring their attention.  In either case, imposition of liability requires a showing that the directors knew that they were not discharging their fiduciary obligations.  Where directors fail to act in the face of a known duty to act, thereby demonstrating a conscious disregard for their responsibilities, they breach their duty of loyalty by failing to discharge that fiduciary obligation in good faith.
>
> Thus, to establish oversight liability a plaintiff must show that the directors *knew* they were not discharging their fiduciary obligations or that the directors demonstrated a *conscious* disregard for their responsibilities such as by failing to act in the face of a known duty to act.  The test is rooted in concepts of bad faith; indeed, a showing of bad faith is a *necessary condition* to director oversight liability.

*In re Citigroup*, 964 A.2d at 123 (emphasis in original; quotation marks, citations, and footnote

call numbers omitted; quoting in part *Stone v. Ritter*, 911 A.2d 362, 369–70 (Del. 2006)).  In other

words, to establish demand futility for *Caremark* claims, Plaintiffs must plead particularized facts

"showing that [Defendants] were conscious of the fact that they were not doing their jobs."

*Guttman*, 823 A.2d at 506 (alteration added).  Such claims are "possibly the most difficult theory

in corporation law upon which a plaintiff might hope to win a judgment."  *Caremark*, 698 A.2d at

967; *see also id.* at 971 (describing the burden as "quite high").

The CAC is devoid of allegations that meet these stringent requirements.  As before,

Plaintiffs do not plead with particularity that Defendants engaged in bad faith or intentional

misconduct when they re-appointed the same independent auditor.  Likewise, Plaintiffs'

allegations that the Individual Defendants face liability for failing to maintain an adequate system

of internal controls regarding diversity — and that they *knew* they were not doing their jobs — are entirely conclusory.  (*See, e.g.*, CAC ¶¶ 92, 202).

Plaintiffs argue Defendants knew of the company's refusal to nominate underrepresented minorities to the Board because they were engaged in such discriminatory misconduct.  (*See* Resp. 13); *Guttman*, 823 A.2d at 507 (explaining allegations that defendants "had clear notice of serious [problems] and simply chose to ignore them or, even worse, to encourage their continuation" would sufficiently plead a *Caremark* claim (alteration added; footnote call number omitted)).  This might suffice if Plaintiffs had sufficiently pleaded Defendants' involvement in the alleged discrimination; alas, they did not.  Plaintiffs cannot proceed on a *Caremark* claim premised on their discrimination claim when they fail to adequately plead that discrimination claim.  Nor can Plaintiffs rely on Defendants' various committee assignments to establish that Defendants acted with the requisite scienter.  (*See* Resp. 13); *Wood*, 953 A.2d at 142; *Baker*, 62 A.3d at 17.

In short, Plaintiffs have failed to plead particularized facts to indicate Defendants face a substantial likelihood of liability on their breach-of-fiduciary-duty claims.  *See Guttman*, 823 A.2d at 500 ("If the legal rule was that demand was excused whenever, by mere notice pleading, the plaintiffs could state a breach of fiduciary duty claim against a majority of the board, the demand requirement of the law would be weakened[.]" (alteration added)); *Seminaris v. Landa*, 662 A.2d 1350, 1355 (Del. Ch. 1995) (dismissing derivative complaint that "allege[d] in a conclusory manner" conduct for which directors might face liability (alteration added)).

### ii.    *Section 14(a) Claim*

Plaintiffs next contend demand is excused because the Individual Defendants face a substantial likelihood of liability on the Section 14(a) claim for omitting certain information from the 2018, 2019, and 2020 Proxy Statements.  (*See* Resp. 14–15).  Section 14(a) "require[s] that

proxy statements not be false or misleading with regard to any material statement, nor omit to state any material fact necessary in order to make the statements therein not false or misleading." *In re The Home Depot, Inc. S'holder Derivative Litig.*, 223 F. Supp. 3d 1317, 1329 (N.D. Ga. 2016) (alteration added; footnote call number and citations omitted); *see also* 15 U.S.C. § 78n(a). A fact or statement is material "if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote." *Va. Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1090 (1991) (quotation marks and citation omitted). "Section 14(a) claims are subject to the demand requirement." *In re The Home Depot*, 223 F. Supp. 3d at 1329; *see also McDowell*, 794 F. App'x at 917.

> To excuse demand, Plaintiffs must specify with particularity:
>
> (1) omissions in the Proxy Statements that made other statements either false or misleading, (2) how those omissions were material, (3) each statement in the Proxy Statements that was made false or misleading, (4) the reason or reasons why the statement is misleading, and (5) how the omission caused the loss complained of.

*In re The Home Depot*, 223 F. Supp. 3d at 1330; *see also Stoneridge Inv. Partners, LLC v. Scientific-Atlanta*, 552 U.S. 148, 165 (2008) (explaining the PSLRA imposes "heightened pleading requirements and a loss causation requirement upon 'any private action' arising from the Securities Exchange Act" (quoting 15 U.S.C. § 78u-4(b))).

Plaintiffs contend the Proxy Statements failed to disclose the following facts: (1) Defendants refused to nominate Black, Latinx, or other underrepresented minorities to the Board or executive team; (2) OPKO did not have term limits due to a desire to keep Black, Latinx, and other underrepresented minorities off the Board; (3) the company failed to maintain adequate internal controls; and (4) the company repeatedly selected an ineffective independent auditor to evaluate its internal controls. (*See* CAC ¶¶ 74, 97–100, 105–108, 113–116, 198). Plaintiffs allege these omissions rendered false and misleading the statements that (1) the company's Code of

Conduct "applies to all employees, officers, and directors" (*id.* ¶¶ 95, 103, 111); and (2) "the Board believes it is important for the Board to have diversity of knowledge base, professional experience[,] and skills, and the Corporate Governance and Nominating Committee takes these qualities into account when considering director nominees for recommendation to the Board" (*id.* ¶¶ 96–97, 104–05, 112–13 (alteration added)).  Based on these representations, shareholders voted to re-elect Defendants and re-approve their selection of the company's independent auditor.  (*See id.* ¶¶ 214–15).

Plaintiffs' allegations fail to pass muster for several reasons.  First, Plaintiffs fail to plead particularized facts as to how the cited statements were materially false or misleading.  Plaintiffs tenuously argue the statement that OPKO's Code of Conduct applies to all employees and directors was misleading because it implies the Code of Conduct was being followed when it was not — as evidenced by what Plaintiffs refer to as "the Discriminatory Misconduct."  (Resp. 8–9; CAC ¶¶ 95, 103, 111, 212).  Although the Court is not wholly convinced a simple statement the Code applied to the directors plausibly supports the inference the Code was being followed, even assuming Section 14(a) liability may be premised on such an inferential leap, the CAC is bereft of particularized allegations showing the Code of Conduct was not followed or that Defendants engaged in "Discriminatory Misconduct."  Instead, Plaintiffs summarily state, as they do many times throughout the CAC, that Defendants violated the Code of Conduct's admonition that "discrimination i[s] not tolerated" by refusing to hire or nominate Black, Latinx, or other underrepresented minorities to the Board.  (CAC ¶ 7 (alteration added; quotation marks omitted); *see also id.* ¶¶ 74, 77, 212).  They supply no examples or facts to substantiate this blatantly conclusory claim.

21

Similarly, Plaintiffs allege no facts showing the Board did not value "diversity of knowledge base, professional experience[,] and skills[.]" (*Id.* ¶¶ 96, 104, 112 (alterations added)). That "zero Black or Latinx individuals currently reside on the [c]ompany's Board" does not support an inference of that statement's falsity. (*Id.* ¶ 7 (alteration added; emphasis omitted)); *see Klein*, 2021 WL 2075591, at *4. Plaintiffs' allegations of Defendants' "explicit or implicit racism" and that Defendants did "not have term limits due to a desire to keep Black, Latinx, and other underrepresented individuals off of the Board" are conclusions unsupported by particularized facts. (CAC ¶¶ 98, 100, 106, 108, 114, 116, 210). Moreover, Defendants point out the Proxy Statement sentences Plaintiffs rely on "do not on their face require consideration of race or color in making director recommendations, and as such, Plaintiffs' conclusion that this aspirational statement requires racial or ethnic diversity is misguided." (Mot. 19). Indeed, as Plaintiffs admit, OPKO's Code of Conduct specifically states it will not base employment decisions on "race" or "color[.]" (CAC ¶ 64 (alteration added)).

Second, courts have repeatedly held that statements concerning a company's commitment to diversity are unactionable puffery. *See Klein*, 2021 WL 2075591, at *7 (alleged misrepresentations about the company's commitment to Board diversity were unactionable "aspirational statements" (quotation marks and citation omitted)); *Ocegueda*, 2021 WL 1056611, at *9 (same (collecting cases)); *Falat v. Sacks*, No. 20-cv-1782, 2021 WL 1558940, at *6 (C.D. Cal. Apr. 8, 2021) (statements that company "seeks to capture diversity in its candidates" and "does not tolerate" harassment or discrimination "are mere puffery and do not constitute objectively verifiable statements of fact" (alterations adopted; quotation marks and citation omitted)); *Lopez v. Ctpartners Exec. Search Inc.*, 173 F. Supp. 3d 12, 19, 28 (S.D.N.Y. 2016) (company's statements about commitment to a "diverse workforce" and "an inclusive and positive

working environment" were "immaterial puffery" and "too hazy and general for any reasonable investor to have relied upon them").

Finally, Plaintiffs have failed to sufficiently plead loss causation.  To sustain a private claim under Section 14(a), a plaintiff must show "that the proxy solicitation itself, rather than the particular defect in the solicitation materials, was an essential link in the accomplishment of the transaction." *Mills v. Elec. Auto–Lite Co.*, 396 U.S. 375, 385 (1970).  The transaction at issue, moreover, must be the source of the plaintiff's injury.  *See id.*  Put differently, "the losses to the company must have resulted directly from the . . . Proxy Statement vote, not from the omission itself[.]"  *In re The Home Depot*, 223 F. Supp. 3d at 1331 (alterations added; citation and footnote call number omitted).

Plaintiffs argue they would not have voted to reelect Defendants if the latter had disclosed their failure to abide by the Code of Conduct's antidiscrimination provision and the ineffectiveness of the company's independent auditor.  (*See* Resp. 9).  But Plaintiffs make no showing the alleged discriminatory misconduct would not have occurred but for Defendants being reelected to the Board and the company's independent auditor being reappointed.  In fact, Plaintiffs acknowledge the alleged discriminatory misconduct began before the 2018 Proxy Statement was issued.  (*See* CAC ¶ 100 (stating the reelection of Defendants and retention of the same auditor following the 2018 Proxy Statement "allowed the illegal and discriminatory practices to *continue*" (emphasis added))).

"Courts have also regularly dismissed Section 14(a) claims based on the election of directors because the losses are indirect."  *In re The Home Depot*, 223 F. Supp. 3d at 1331; *see also McDowell*, 317 F. Supp. 3d at 1180–81.  This is so because "the election of directors who violate[] [corporate] policies only indirectly cause[s] the shareholders' loss."  *Edward J. Goodman*

*Life Income Tr. v. Jabil Cir., Inc.*, 594 F.3d 783, 797 (11th Cir. 2010) (alterations added; discussing *Gen. Elec. Co. v. Cathcart*, 980 F.2d 927, 933 (3d Cir. 1992) (in case where the plaintiff alleged that non-disclosure of illegal activity and company mismanagement caused him to vote to reelect board members, no loss causation because it was management's failure to follow corporate policies, and not the actual election of directors, that contributed to the shareholder's loss)). Because the reappointment of OPKO's independent auditor and the "reelection of directors w[ere] not [] essential link[s] to the losses of which [Plaintiffs] complain[,]" Plaintiffs have failed to show loss causation. *Id.* (alterations added).

For these reasons, Plaintiffs have failed to plead particularized facts suggesting Defendants face a substantial likelihood of liability on their Section 14(a) claim.  Demand is therefore not excused on that basis.[9]

### 2.    Other Personal Benefit or Interest

In addition to arguing Defendants face a substantial likelihood of liability, Plaintiffs proffer several other reasons why Defendants would not be able to consider a demand in a disinterested manner.

Plaintiffs vaguely assert demand should be excused because Defendants sought to entrench themselves by taking the challenged actions.  (*See* CAC ¶ 91, 176, 214; Resp. 4).  This contention, however, is plagued by a familiar shortcoming: Plaintiffs have not alleged particularized facts.  *See Gottlieb v. Duskin*, Civ. Act. No. 2019-0639, 2020 WL 6821613, at *7 (Del. Ch. Nov. 20, 2020) (demand not futile where the plaintiff's "allegations of an entrenchment motive are thin[;]" "[p]laintiff conclusorily alleges that the director defendants entrenched themselves at the expense of the company shareholders[;]" and plaintiff failed to "offer specific pleadings that a majority of

---

[9] The Court makes no finding as to whether Plaintiffs' allegations would suffice to state a claim under Rule 12(b)(6), as opposed to the more stringent requirements of Rule 23.1.

the directors were motivated primarily by entrenchment" (alterations added; citations, quotation marks, and footnote call numbers omitted)); *Kahn v. Roberts*, Civ. Act. No. 12324, 1994 WL 70118, at *6 (Del. Ch. Feb. 28, 1994) ("[A]n entrenchment theory based on supposition rather than alleged fact does not excuse a pre-suit demand." (alteration added; citation omitted)).

Nor have Plaintiffs alleged with particularity that an actual threat to Defendants' positions on the Board existed. *See Greenwald v. Batterson*, No. 16475, 1999 WL 596276, at *5 (Del. Ch. July 26, 1999) ("[T]he mere allegation that directors have taken action to entrench themselves, without an allegation that the directors believed themselves vulnerable to removal from office, will not excuse demand." (alteration added; citation omitted)); *Ryan v. Gursahaney*, Civ. Act. No. 9992, 2015 WL 1915911, at *6 (Del. Ch. Apr. 28, 2015) (demand not excused where "the particularized facts do not support a reasonable inference that the Director Defendants perceived an actual 'threat' of removal and were motivated to avoid it"). In short, Plaintiffs' allegations of an entrenchment motive are simply too speculative to create a reasonable doubt about Defendants' disinterest.

To the extent Plaintiffs contend demand would be futile because Defendants would be required to sue themselves or each other (*see* CAC ¶ 185–86), that argument has been consistently rebuffed by Delaware courts. *See In re Citigroup*, 964 A.2d at 121 ("Demand is not excused solely because the directors would be deciding to sue themselves." (citation and footnote call number omitted)); *In re The Home Depot*, 223 F. Supp. 3d at 1324 ("[U]nder Delaware law[,] derivative action plaintiffs do not ring the futility bell merely by including a majority of the directors as defendants. To do so would eviscerate the demand requirement entirely." (alterations added; citation, quotation marks, and footnote call number omitted)); *Aronson*, 473 A.2d at 814 (reaching

the same conclusion, explaining "[w]ere that so, the demand requirements of our law would be meaningless" (alteration added)).

Plaintiffs further allege demand would be futile given the potential existence of a so-called insured versus insured clause if OPKO has directors' and officers' liability insurance. (*See* CAC ¶ 185). Specifically, Plaintiffs argue that under such a clause, "if the Director-Defendants were to sue themselves or certain of the officers of OPKO, they would enjoy no insurance protection. Accordingly, the Director-Defendants cannot be expected to sue themselves or the relevant officers of OPKO. However, if the suit is brought derivatively, as is this action, such insurance coverage, if it exists, will provide a basis for the [c]ompany to effectuate a recovery." (*Id.* (alteration added)). Plaintiffs ignore that "demand futility based on the existence of an 'insured vs. insured' exclusion in the [c]ompany's directors' and officers' liability insurance policies is an argument that has been rejected repeatedly under Delaware law." *In re Am. Int'l Grp., Inc. Derivative Litig.*, 700 F. Supp. 2d 419, 433 (S.D.N.Y. 2010) (first alteration added; other alteration adopted; quotation marks and citation omitted; collecting cases); *see also Carauna v. Saligman*, Civ. Act. No. 11135, 1990 WL 212304, at *4 (Del. Ch. Dec. 21, 1990) (finding such an argument to "be nothing more than variations on the 'directors suing themselves' and 'participating in the wrongs' refrain" (quotation marks and citation omitted)).

Plaintiffs also maintain Defendant Frost is inherently interested because he is the controlling shareholder and CEO of OPKO. (*See* CAC ¶ 129). Yet "[t]he mere fact that [Frost] is a controlling shareholder [and CEO] is not enough to establish his lack of independence [or that he is interested] because that would eviscerate the disinterested prong of the demand futility te[s]t and would find a director involved in the day-to-day running of a company to be 'interested' under any set of facts." *Ocegueda*, 2021 WL 1056611, at *7 (alterations added; quotation marks and

citation omitted).  Plaintiffs emphasize Frost's earnings and assert that "[a]s CEO, [he] was ultimately responsible for the misleading Proxy Statements, and for controlling the [d]iscriminatory [m]isconduct" (Resp. 16 (alterations added)), but this argument "skips a step: Plaintiffs must still allege particularized facts that show the wrongdoing in the first instance." *Klein*, 2021 WL 2075591, at *7.  As explained above, Plaintiffs have failed to do so.  And ultimately, "[w]ithout adequate allegations of wrongdoing[,] it does not matter that [Frost] is a controlling shareholder." *Id.* (alterations added).[10]

Finally, Plaintiffs appear to argue Defendants are interested because they receive "substantial compensation" as company directors and executives.  (*See* CAC ¶¶ 129, 137, 143, 153, 160).  Allegations that directors are paid for their services as directors are insufficient to establish interest.  *See In re Walt Disney Co. Derivative Litig.*, 731 A.2d 342, 360 (Del. Ch. 1998), *aff'd in part, rev'd in part on other grounds sub nom. Brehm v. Eisner*, 746 A.2d 244 (Del. 2000) ("[T]he Delaware Supreme Court has held that such allegations of payment of director's fees, without more, do not establish any financial interest." (first alteration added; other alterations adopted; citation, quotation marks, and footnote call number omitted)).  And although dependence on a director position for one's livelihood may be evidence of beholdenness, "beholdenness is only relevant where there is an interested person[.]"  *In re Dow Chem. Co. Derivative Litig.*, Civ. Act. No. 4349, 2010 WL 66769, at *8 n.44 (Del. Ch. Jan. 11, 2010) (alteration added; citation omitted).  Here, there is not.

Put simply, Plaintiffs have not pleaded sufficient particularized facts to overcome the presumption that the Individual Defendants' "interests are aligned with the company" and they

---

[10] Plaintiffs' allegations concerning OPKO's transactions with other companies affiliated with Frost are irrelevant.  (*See* CAC ¶ 130).  The interested prong of the demand futility analysis focuses solely on whether a director is interested with respect to the challenged action underlying the suit.

"are able to make decisions in the best interests of the company." *Id.* at *8. Absent such a showing, Plaintiffs have not met their burden to demonstrate demand on the Board would have been futile. Accordingly, the Court need not consider Plaintiffs' numerous allegations regarding the independence of the remaining directors — which, ironically, are the only particularized allegations in the CAC. *See id.* at *7; *Klein*, 2021 WL 2075591, at *8. Because Plaintiffs have failed to plead demand futility with particularity, their claims are dismissed.

## IV.   CONCLUSION

For the foregoing reasons, it is

**ORDERED AND ADJUDGED** that Defendants' Motion to Dismiss Plaintiffs' Verified Shareholder Derivative Consolidated Amended Complaint **[ECF No. 62]** is **GRANTED**. Plaintiffs' Consolidated Amended Complaint **[ECF No. 61]** is **DISMISSED** without prejudice.[11] If Plaintiffs wish to file a motion for leave to file an amended complaint, they must do so on or before **September 10, 2021**, failing which the Court will dismiss this action without prejudice and without further notice.

**DONE AND ORDERED** in Miami, Florida, this 31st day of August, 2021.

*Cecilia M. Altonaga*

**CECILIA M. ALTONAGA**
**CHIEF UNITED STATES DISTRICT JUDGE**

cc:     counsel of record

---

[11] Plaintiffs' request for leave to amend is denied without prejudice. (*See* Resp. 21). "Where a request for leave to file an amended complaint simply is imbedded within an opposition memorandum, the issue has not been raised properly." *Rosenberg v. Gould*, 554 F.3d 962, 967 (11th Cir. 2009) (citation and quotation marks omitted). Such a request should be made by motion and must either "attach a copy of the[] proposed amendment or [] describe the substance of the[] proposed amendment." *Id.* (alterations added; citation omitted). If Plaintiffs wish to further amend their Complaint, they must seek leave to do so in accordance with the proper procedures and applicable Local Rules.